## John Greenough v. Thomas Greenough.

11   489
148   59
11   489
J 172 148
11   489
199   559
199   560
11        489
22 SC ¹266

1. The act of the 27th January, 1848, supplementary to an act relating to last wills and testaments, passed 8th April, 1833, is exclusively prospective, and is destitute of retro-active force, because it was an act of judicial power and contravenes the declaration of the Constitution of Pennsylvania, § 9, art. 9, that no person shall be deprived of life, liberty, or *property*, except by the judgment of his peers or *the law of the land*.

2. An express direction to sign a testator's name to a will must be proved, expressly or presumptively, by the oaths or attestations of two witnesses: and a subsequent act of ratification by the testator signing the will with a mark is not presumptive evidence of such express direction.

3. The positive testimony of one subscribing witness to the fact that he signed a testator's name to a will by his express direction, and the attestation of the will by the other subscribing witness, who was present at its execution, but whose memory failed as to the fact of express direction: are *primâ facie* evidence of express direction.

Error to the District Court of Allegheny.

*Sept.* 17. This was an action of ejectment by John against Thomas Greenough. It appeared that Elizabeth Greenough died seised of the premises, unmarried, without issue, and leaving three brothers and a sister. The plaintiff and defendant were brothers

of Elizabeth. She executed a will on the 17th August, 1840, and died ten days afterwards.

The plaintiff below, relying upon her dying intestate, offered no evidence other than the admission of the foregoing facts; denying, however, the legal execution of the will.

The defendant, claiming under the will, examined the subscribing witnesses to it, whose material testimony was as follows :—

Andrew Nicholson, sworn.—I signed this will as a witness. I went to her bed-side, and was introduced to Elizabeth Greenough. The will was read to her. It is my impression she requested me to sign it as a witness : either before or after it was read. She declared it to be her last will and testament, after it was read to her. M. B. Lowrie also signed it in the presence of the testatrix, and in my presence. I saw her make the mark, with the assistance of Lowrie steadying her hand. She was nervous at the time. The name was written by Lowrie, I think : it was there when she made her mark. She was feeble, and not able to write.

Cross-examined.—She was very nervous; her hand shook very much. *I don't recollect her asking Lowrie to write her name.* It would not have been possible for her to write her name. No conversation about her mark or signature afterwards. She appeared exhausted—said nothing. She grew worse after the will was signed, till she died. *I did not hear her request any person to write her name.*

M. B. Lowrie, sworn.—I wrote this will, under Elizabeth's direction, from her dictation. I read it carefully over, and she assented to it, and *when I took it to her to sign it, she said she was not able, and requested me to sign it for her. I did so.* Before she subscribed her mark, I asked her if she acknowledged this to be her last will, and if we, myself and another, should sign it as witnesses. She assented to both, and I then subscribed it as a witness, and Nicholson also in my presence. She made her mark to the will in my presence. She could write before this, I think, but not at this time.

Cross-examined.—I may have steadied her hand, but she made the mark.

This will devised the land in controversy to Thomas, the defendant, for life, and after his death to be divided among the children of John, and others.

The signature of the will and the mark, described by the subscribing witnesses, was in this form.

her<br>
Elizabeth ✕ Greenough<br>
mark.

The will was admitted to probate, 19th May, 1842.

The jury was directed *pro formâ* that the will was well proved, and good and valid in law, and that the defendant was entitled to their verdict. The questions of law were reserved. In the opinion subsequently delivered by HEPBURN, President, the learned judge held that the proof of the testatrix expressly directing Lowrie to sign her name to the will was insufficient, under the act of 1833, and that the will was of no effect under that act, but that the proof of her mark, under the act of 1848, was sufficient—that law acting upon the remedy and not upon the estate, and so violating no constitutional provision. Judgment on the verdict for the defendant.

The errors assigned here were

1. That the court erred in deciding that the act of 27th January, 1848, supplementary to the act relating to last wills, &c., did not violate any constitutional provision, and did no injustice to the plaintiff.

2. That the court erred in deciding that the will in question clearly falls within the provisions of the act of 27th January, 1848.

Mr. *Attorney-General* and *Shaler*, for the plaintiff in error.—1. Was the paper purporting to be the will of E. G. an effective will under the act of 1833?

Dunlop *v.* Dunlop, 10 W. 193; Cavett's Appeal, 8 W. & S. 26; Asay *v.* Hoover, 5 Barr, 21; Grabill *v.* Barr, 5 Barr, 441. The only substitute for a name written by the testator himself, is his name written by some one at his request, which request must be proved by two witnesses. We have not that substitute here, so Elizabeth Greenough died intestate, and her real estate descended *eo instanti*, and vested in her brothers and sisters.

2. The execution of this paper not being valid under the act of 1833, is it aided by the act of 1848? The testatrix here did not make a cross or mark; it was the act of the scrivener, who used her hand without any authority. She did not acknowledge that mark after it was made.

Had the plaintiff a vested interest in the land in controversy, on the day of the passage of the act of 1848?

The act of 8th April, 1833, is explicit: "if not disposed of by will, the estate shall *descend* and *vest*," and that took place here. The plaintiff acquired an immediate fixed right of present enjoyment upon the death of his sister—a vested interest. Can the legislature destroy that, or transfer it to another?

Brown *v.* Hummell, 6 Barr, 87; Austin *v.* The Trustees, 1 Y.

260; Green *v.* Drinker, 7 W. & S. 440; Norman *v.* Heist, 5 W. & S. 171; Menges *v.* Wertman, 1 Barr, 223; Society for Prop. the Gospel *v.* New Haven, 8 Wheaton, 464; Tate *v.* Stoolfoos, 16 S. & R. 38; Jackson *ex dem. v.* Lyon, 9 Cowen, 664; Rogers *v.* Smith, 4 Barr, 98; Bolton et al. *v.* Johns, et al.; Dale *v.* Medcalf, MS. opinion of Burnside, J.

*Howard* and *Forward,* contrà.—1. Is the will good under the act of 1833? We have proved compliance with every requisition of that act, except that we cannot show her " express direction" to Lowrie to sign her name, by the two subscribing witnesses: one of them forgets it. Suppose that one had died before probate, would not the evidence of the living witness, and proof of the handwriting of the deceased one, be sufficient evidence of its execution? But the mark is a sufficient signature at common law; and when the name is written by another, any act, from which an acknowledgment may be inferred, such as making this mark, makes it valid binding on the party.

Stat. 7 Will. 4, re-enacted in 1 Victoria, cap. 26, §§ 9, 10, 12, are word for word like § 6 of our act of 1833. Mark is a good signing in England: 3 Har. Dig. 664. *If witness forgets, the presumption is in favour of the due execution of the will:* 5 Har. Dig. 591. One witness swears he saw testator sign, and the other *forgets*—it is sufficient: 3 Curt. Eccles. 54; 8 Jurist, 814; Burgoyne *v.* Shouler, 7 Jurist, 633.

Attestation of a devise by mark is good signing within statute of frauds: Addey *v.* Grix, 8 Ves. 504; 17 Ves. 450; Wright *v.* Wankford. A name printed and acknowledged, sufficient: 2 M. & S. 288; 14 Johns. 484; Vattel, p. 315, § 273; Ib. § 234.

A will, prepared for one, who from paralysis had lost the use of speech, and could not write, signed by a mark and duly attested, sufficient: 3 Curtis, 752, a case since 1 Victoria; Cavett's Appeal, &c. A will appearing to be truly executed, the presumption of law is in favour of its due execution, and if the witnesses are entirely *forgetful* of the transaction, the presumption is the same: 8 Jurist, 814; 5 Har. Dig. 598. The presumption here is, that the execution is at least *primâ facie* good. How could it be known whether the testatrix could or could not write without an adjudication? or that she did not write the name? or that it was or was not written at her request? If a judicial proceeding was necessary to ascertain these facts, then the will, under the act of 1833, was not *void,* but at most only *voidable,* and nothing vested in the heirs-

at-law, and the will is made good by the act of 1848: Bradee *v.* Brownfield, 2 W. & S. 280. The probate relates back to the death of the testatrix, and makes the will *primâ facie* good, and no right could vest in the heirs until it is annulled.

Does the act of 1848 disturb vested rights? is it constitutional? The act is partly legislative, partly judicial: Bradee *v.* Brownfield; Hepburn *v.* Curts, 7 W. 301. Those cases are as strong as this. The plaintiff has no natural right to his sister's property; and what the legislature gave, before actual possession is taken, it may take away: Mercer *v.* Watson, 8 Peters, 110. An act is only void for violating an express contract. This court will not imply a contract: 3 Peters, 388. The parties' remedy is in the wisdom of the legislature: 11 Peters, 468.

A devisee takes as a purchaser. The contest here, then, is between a purchaser and a volunteer: the purchaser, at the worst, claiming under a title originally defective in its execution: Thomas *v.* Simpson, 3 Barr, 70. By statute, an *inchoate* right vests in heirs: Evan *v.* Montgomery, 4 W. & S. 218. Legislature may give or take away statutory *remedies*.

The legislature have not undertaken to deal with the making of wills, but only with the mode of execution and the evidence of them: Mercer *v.* Watson, 1 W. 357. Acts curing defects in acknowledgments of deeds have been held constitutional: 4 S. & R. 356.

8 Peters, 110; Satterlee *v.* Matthewson, 2 Peters, 380; same case, 13 S. & R. 133; Wilkinson *v.* Leland, 2 Peters, 653. Legislature may diminish salaries where they are fixed by law, and the appointment is for a definite number of years: Canal Com'rs. *v.* Commonwealth, Am. Law Journal, Aug. 1848, p. 79; 3 Peters, 288; 11 Peters, 468; 12 Ohio, 308; 13 Vermont, 582; 19 Pick. 48.

As to vested rights, Menges *v.* Wertman, 1 Barr, 218. The presence or absence of a moral obligation seems to be the test. If the plaintiff here were a purchaser for value, with a defective conveyance, he might have a moral right to recover; but he is a volunteer claiming against a purchaser, and, though the execution of the will should be found defective, if cured by act of 1848, the defendant's case is as strong in equity as was that of the sheriff's vendee in Menges *v.* Wertman, and the plaintiff's case is not as strong as that of Menges' heirs, for he never had possession or any decision in his favour. We have been executing deeds according to this will—making valuable improvements—for

2 T

nine years past, and the plaintiff never objected.  This delay estops him.

The opinion of this court was delivered by

GIBSON, C. J.—So far as regards wills consummated by the testator's death—and this is one of them—the act of 1848 is founded on no power known to the constitution, but on the assumption of a power appropriated exclusively to the judiciary.  Every tyro or sciolist knows that it is the province of the legislature to enact, of the judiciary to expound, and of the executive to enforce.  These functions may, if the people will it, be performed by a single organ; but the people of Pennsylvania have not so willed it.  They have ordained that the judicial power of the Commonwealth be vested in a Supreme court, in County Courts of Common Pleas, Oyer and Terminer, and Quarter Sessions, in a Register's Court, and an Orphans' Court : and in such other courts as the legislature may from time to time establish.  But the judicial power of the Commonwealth is its whole judicial power; and it is so distributed, that the legislature cannot exercise any part of it.  Under the constitution, therefore, there is no mixed power—partly legislative and partly judicial—such as was recognised in Bradee v. Brownfield.  Did it exist, it could be exercised only in concert or in common; for it would give the judiciary as much right to legislate as it would give the legislature right to adjudicate.  Thus blended, I know of no constitutional power, principle, or provision, that would give to either of them, as a co-ordinate branch, an exclusive right to the whole.  What then did the legislature propose by the statute of 1848 ?  This court had ruled in Asay v. Hoover directly, and in Barr v. Strobell, Cavett's Appeal, and perhaps Hays v. Harden, incidentally, that a testator's mark to his name, at the foot of a testamentary paper, but without proof that the *name* was written by his express direction, is not the signature required by the act of 1833; and the legislature has declared, in order to over-rule it, that "every last will and testament heretofore made, or hereafter to be made, except such as may have been finally adjudicated prior to the passage of this act, to which the testator's name is subscribed by his direction, or to which the testator has made his mark or cross, shall be deemed and taken to be valid."  How this mandate to the courts, to establish a particular interpretation of a particular statute, can be taken for anything else than an exercise of judicial power in settling a question of interpretation, I know not.  The judiciary had certainly recognised a legislative

interpretation of a statute before it had itself acted, and consequently before a purchaser could be misled by its judgment; but he might have paid for a title on the unmistakeable meaning of plain words; and for the legislature subsequently to distort or pervert it, or to enact that white meant black, or that black meant white, would, in the same degree, be an exercise of arbitrary and unconstitutional power. All *ex post facto* laws are arbitrary; and it is to be regretted that the constitutional prohibition of them has been restricted to laws for penalties and punishments. In a moral or political aspect, an invasion of the right of property is as unjust as an invasion of the right of personal security. But retroactive legislation began and has been continued, because the judiciary has thought itself too weak to withstand; too weak, because it has neither the patronage nor the *prestige* necessary to sustain it against the antagonism of the legislature and the bar. Yet, had it taken its stand on the rampart of the constitution at the onset, there is some little reason to think it might have held its ground. Instead of that, it pursued a temporizing course till the mischief had become intolerable, and till it was compelled, in Norman *v.* Heist and Bolton *v.* Johns, to invalidate certain acts of legislation, or rather to reverse certain legislative decrees. Conceding the right of legislative interpretation in the first instance, because it has prevailed too long to be disputed, we can pronounce the act of 1848 to be exclusively prospective without disturbing titles.

It is destitute of retroactive force, not only because it was an act of judicial power, but because it contravenes the declaration in the ninth section of the ninth article of the constitution, that no person shall be deprived of life, liberty, or property, except by the judgment of his peers or the law of the land. Taking the proof of execution, at this stage of the argument, to be defective under the act of 1833, it would follow that the plaintiff had become the owner of a third of the property in contest, by the only assurance that any man can have for his property—the law. Yet the legislature attempted to divest it, by a general law it is true, but one impinging on particular rights. Still it is argued that the act may be sustained as a confirmation of conveyances by will, as a confirmation of conveyances by deed was sustained in Underwood *v.* Silly, Mercer *v.* Watson, and other cases of the class. It was remarked in Menges *v.* Wertman, that a party, who has received a benefit from a transaction, is under a moral obligation to convey, and that the legislature may add a legal one to it; and I still think that a distinction between a purchaser and a volunteer, is the only ground

left us to found a practical limitation of special legislation. In this case, the devisee is a volunteer, and the heirs are bound by no obligation which did not bind the legitimate heirs in Norman *v.* Heist. But the great obstacle in Menges *v.* Wertman, was the number of titles that depended on legislation of the same stamp. I have doubted whether we ought not to have swept them all away; but we had a choice of evils set before us, and want of steadiness in the judiciary was thought to be the greater one. Decision, however, has not established a rule of property to control us in the present case; for judicial interpretation of the act of 1833 had preceded the act of 1848. The statutes in Hess *v.* Wertz and Satterlee *v.* Mathewson were enacted, not to create a contract or to confirm one, but to remove a disability; and the protection not of a party, but the public, was certainly within the constitutional range of legislative action.

The defendant's next position is, that the testatrix's name, written by another, without her express direction, but acknowledged by her mark, was within the true intent and meaning of the original act, which requires that " every will shall be in writing, and unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence and by his *express direction.*" But this express direction, like signing by the testator in the presence of the attesting witnesses, and attestation by them in his presence and in the presence of each other, under the English statute of frauds, is a substantive part of the act of execution prescribed by the statute under consideration; and where it is not proved, expressly or presumptively, by the oaths or attestation of two witnesses, it is not proved at all. Why use emphatic words, if there was no design to distinguish between an express and an implied direction? Though express direction may be proved by presumptive evidence, it follows not that a subsequent act of ratification by the mark, is presumptive evidence of it. A direction precedes the act to be done in obedience to it; and in this respect a direction expressed in words, differs from a direction implied from subsequent assent. There is a maxim that ratification is equivalent to command; but it was held in Dunlop *v.* Dunlop, not to be express direction. The question at this stage of the inquiry is not, whether the attestation may not be evidence of previous direction, but whether the mark *is.* It is not disputed that it is evidence of ratification : but what magic is there in ratification by the testator's pen, which is not found in ratification by his tongue, which was held not to be express direc-

tion in Dunlop v. Dunlop? Does the mark constitute the signature? or does the name? or do both together? Take it that the signature is only a sign; still, to import anything, it must be a sign of something. It must have an intrinsic or a conventional meaning without being interpreted by anything appended to it. A name without a mark to it, individuates the person, and may express his assent to an act done by him: a mark without a name to it, individuates or expresses nothing. A cross, or a scratch, or a scrawl, or a dot, or a dash, or a flourish, unassisted by the name, imports no more than would a blot, or a stain, or any other accidental discolouration of the paper at the foot of the instrument. When few could write, a seal was the more frequent symbol: it signified the name of the party as intelligibly as if it had been expressed by a combination of letters, which also is no more than a conventional sign of it. A naked mark is not a signature at the common law; and the statute was not designed to make it so. It requires the whole signature to be written by the hand of the testator, or by the hand of a bystander—not a part of it by the one and a part of it by the other—and for the bystander to write the name and the testator to make the mark is no more a fulfilment of its requisition than if their agency in the transaction was inverted, or the bystander had, without express direction, written the one and made the other. Yet if the mark were an integrant part of the signature, it would have to be made by somebody, though the testator were too feeble to put pen to paper. If it is not an integrant part, what office does it perform? As an act of verification, it is as insignificant when made by the testator as when made by a stranger. No one would pretend that a dot would be enough, and the statute consequently requires the name; and as it sanctions nothing which it does not enjoin, a mark is surplusage, and consequently ineffective. It substitutes for it the name written by the testator's express direction, as a more rational act of authentication, in order to dispense with it. Even without a statute to help it, the seal of a party, affixed by another in his presence and with his assent, was held, in Hart v. Withers, 1 Penn. R. 285, on the authority of Ball v. Dunsterville, 4 T. R. 313, to be his immediate act. As signing by the testator's assent would have been good at the common law, the statute was enacted not to authorize it, but to regulate the evidence of it by requiring more than a wink or a nod, or a word not less ambiguous, and therefore not less liable to misconstruction or misrepresentation. The purpose of it was to have a straightforward direction expressed in terms, which would leave no pretence

for the touch of an insensible or dead man's hand to give colour to an artful tale told by willing witnesses. In other transactions, the mark is sometimes used as a badge of assent; but the assent required by the statute is to be signified, not by a badge attached to the name, but by a direction to attach the name to the paper. Were we to receive the *implication* of a direction as an equivalent for the *express* direction demanded by the statute, we should overrule Dunlop v. Dunlop, in which the doctrine of equivalents was rejected, and Burwell v. Corbin, 1 Rand. 131, which is a strong authority for the principle. The judgment in the latter was founded on the construction of a statute in Virginia, enacted in the words of our own. The will was proved by one of the attesting witnesses, to have been signed with the testator's name by his express direction; and the other, who had not been present, but attested it the next day, proved that the testator acknowledged it to be his will; and, though this recognition by words was more explicit than recognition by a mark, the proof was held to be deficient. After all, therefore, it is the name written by the testator's express direction which constitutes the signature; and the question comes to this: was the positive testimony of one of the attesting witnesses, and the attestation of the other, in the absence of his recollection, proof of it?

Where the oath cannot be had, it is settled that the attestation is a substitute for it, and proof of compliance with the requisitions of the statute. Such is the principle of Hands v. James, 2 Comyn, 531, Provis v. Reed, 5 Bingh. 435, and 5 Ves. 504. In Croft v. Pawlett, 2 Stra. 1109, the attestation was in the usual form, except that it was not said in it that the witnesses had signed in the testator's presence; and on an objection that it stood for proof of no more than the facts to which they subscribed, was disregarded. Even where the witness is present, but his memory is not, his attestation stands for proof. In Dayrell v. Glasscock, Skin. 413, Lord Holt held it sufficient, in the first instance, to prove the attestation of a witness, who would not swear to the sealing and publication. Pretty much to the same effect is Turnipseed v. Hawkins, 1 M'Cord, 272; Brice v. Smith, Willis, 1; Fetherly v. Waggoner, 11 Wend. 599, and Fitzhubert v. Fitzhubert, 4 B. C. C. 231. These prove very satisfactorily that the attestation of a witness dead, blind, insane, subsequently incompetent, or out of the reach of process, is *primâ facie* evidence of every necessary fact. But what avails it that the man is living, if his memory is dead? If it were blotted out by paralysis, or worn out by decay, his attestation

would stand for proof by a witness; but it must be immaterial how, or by what means, it lost its tenacity. The law of double proof would place wills on ticklish ground, did it leave them to depend on the incorruptibility of attesting witnesses, or on their exemption from growing infirmity. Even where they flinch from their attestation, it satisfies the demands of the statute in the first instance, and is evidence to confront them before a jury. After the testator has executed his will in confirmity to the requirements of the law, it would be a mockery of his right of testamentary disposal, to exclude presumptive or secondary evidence of a compliance with forms, that would be received in cases of another nature. I lay out of the case the supposed effect of the probate, which, though it might entitle the paper to be read in the first instance, cannot shift the burthen of proof in a question like the present. As a special case seems to be made for the opinion of the court, and not the jury, I am of opinion that the attestation was *primâ facie* evidence, and sufficient.

Judgment affirmed.