EBERHART et al. v. UNITED STATES, for Use of FIRST NAT. BANK OF BELLE FOURCHE, S. D.

UNITED STATES v. EBERHART et al.

(Circuit Court of Appeals, Eighth Circuit. March 13, 1913. Supplemental Opinion, May 1, 1913.)

Nos. 3,770, 3,829.

1. UNITED STATES (§ 67*)—CONTRACTORS' BONDS—LIABILITY OF SURETIES.
    Where a bond was given by a contractor for government work under Act Feb. 24, 1905, c. 778, 33 Stat. 811 (U. S. Comp. St. Supp. 1911, p. 1071), the bond containing the additional condition required by the act that the contractor should promptly make payments to all persons supplying him with labor and materials in the prosecution of the work, the liability of the sureties under such special obligation is measured by the terms of the act, which is an indispensable part of their contract.
    [Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. § 67.*]

2. UNITED STATES (§ 67*)—CONTRACTORS' BONDS—LIABILITY OF SURETIES TO LABOR AND MATERIAL CREDITORS—LIMITATION.
    Act Feb. 24, 1905, c. 778, 33 Stat. 811 (U. S. Comp. St. Supp. 1911, p. 1071), which amended and superseded Act Aug. 13, 1894, c. 280, 28 Stat. 278 (U. S. Comp. St. 1901, p. 2523), provides that bonds given by contractors for public work shall contain the additional obligation that the contractor shall promptly make payments to all persons supplying him with labor and materials in the prosecution of the work. It further provides that any person or persons supplying the contractor with labor or materials, payment· for which has not been made, may intervene in any action brought by the United States on the bond, and that if no such action shall be brought within six months from the completion and final settlement of the contract they may bring a single suit in the name of the United States in the district in which the contract was to be performed, and not elsewhere, provided that such suit "shall be commenced 'within one year after the performance and final settlement of said contract and not later." Held, that such limitation was a condition of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

liability of the sureties to labor and material creditors; that where a bond was executed under such statute, on the expiration of one year from the time the contract was completed and final settlement made, no suit having been commenced by either the United States or by labor and material creditors, the sureties were discharged from any liability to such creditors; and that Congress could not revive such liability by a special act, passed thereafter, authorizing the creditors to bring suit under the terms of the original act before amendment, which contained no such limitation.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. § 67.*]

In Error to the District Court of the United States for the District of Minnesota; Chas. A. Willard, Judge.

Action at law by the United States, for the use and benefit of the First National Bank of Belle Fourche, S. D., against Adolph O. Eberhart and others. Judgment for the use plaintiff, and defendants bring error. Reversed.

Action by the United States against the same defendants. Judgment for defendants, and the United States brings error. Affirmed.

On April 26, 1905, the United States entered into a contract with the Widell-Finley Company, a corporation created by and existing under the laws of the state of Minnesota, for the construction by the Widell-Finley Company of a dam and canal in the state of South Dakota according to plans and specifications furnished. The defendant in the court below, Adolph O. Eberhart, and his codefendants, became sureties for the contractor in the sum of $21,500, conditioned, as required by law, that "it shall in all things well and truly observe, perform," etc., "the covenants, conditions and agreements," etc., "mentioned in certain articles of agreement bearing date the 26th day of April, 1905, * * * concerning the construction and completion of the work provided in schedule 2, main supply canal, Belle Fourche project, South Dakota." etc., "and shall promptly make payment to all persons supplying labor and materials for the prosecution of the work provided for."

The contract for the faithful performance of which this bond was executed contained, among other provisions, the following: Eighth: "Engineer.— Where the word 'engineer' is used in the general conditions or detailed specifications, or in the contract, it shall be and is mutually understood to refer to the Chief Engineer of the Reclamation Service, or any of his authorized assistants or inspectors, limited by the particular duties intrusted to them. * * * Upon all questions concerning the execution of the work and the classification of the material, in accordance with the specifications, the decision of the engineer shall be binding on both parties. All materials furnished and all work done shall be subject to rigid inspection, and if not in accordance with the specifications, in the opinion of the engineer, shall be made to conform thereto. Unsatisfactory material will be rejected and shall be immediately removed from the premises, at the cost of the contractor, if so ordered by the engineer."

Paragraph 21 provides: "Suspension of Contract.—Should the contractor fail to begin the work within the time required, or fail to begin the delivery of material as provided in the contract, * * * then and in either case the Secretary of the Interior shall have the power to suspend the operation of the contract, and he may take possession of all machinery, tools, appliances, and animals employed on any of the works to be constructed under the contract and of all materials belonging to the contractor delivered on the ground, and may use the same to complete the work, or he may employ other parties to carry the contract to completion, substitute other machinery or materials, purchase the material contracted for in such manner as he may deem proper, or hire such force and buy such machinery, tools, appliances, materials, and animals at the contractor's expense as may be necessary for the proper con-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

duct of the work and for finishing it in the time agreed upon. Any excess of cost arising therefrom over and above the contract price will be charged against the contractor and his sureties, who shall be liable therefor."

Paragraph 24: Changes.—By this paragraph the Secretary of the Interior reserved the right to make changes in the specification of work or material as may be deemed advisable without notice to the sureties on the bond. This right to make material changes in the quantities listed in the proposal is made an essential part of the contract. It then provides: "Should any change be made in a particular piece of work after it has been commenced, so that the contractor is put to extra expense, the engineer shall make reasonable allowance therefor, which action shall be binding on both parties."

Paragraph 25 provides: "Structural Difficulties.—Should structural difficulties prevent the execution of the work as described in the plans and specifications, necessary deviations therefrom may be permitted by the engineer, but must be without additional cost to the United States."

The contractor having been adjudicated a bankrupt in February, 1906, after he had performed a part of the contract, the receivers of the estate continued the work by authority of the bankruptcy court until March 8, 1906, when the United States took charge of it under the provisions of paragraph 21 of the contract, and completed it by November 30, 1908. On June 16, 1908, a final statement of the account was made by the United States, and demand for payment made of the contractor; on December 26, 1908, demand for the penalty of the bond was made on the sureties.

On April 26, 1910, the government instituted suit in the Circuit Court of the United States for the District of Minnesota, where the defendants all resided. This suit is No. 3,829 in this court. On March 18, 1911, the First National Bank of Belle Fourche instituted its suit in the same court, as assignee of the laborers whose time checks it had purchased. Although the two suits were separately instituted, and at different times, they were by direction of the court tried together to a jury. The jury returned a verdict in No. 3,770 in favor of the First National Bank for the full amount claimed, with interest thereon, amounting in the aggregate to the sum of $23,693.44, and in the action by the government, No. 3,829, returned a verdict for the defendants.

Charles C. Houpt, U. S. Atty., of St. Paul, Minn., and S. S. Ashbaugh, Sp. Asst. Atty. Department of Justice, of Washington, D. C., for plaintiff in error in No. 3,829.

H. L. Schmitt, of Mankato, Minn. (John W. Schmitt and Lorin Cray, both of Mankato, Minn., on the brief), for plaintiffs in error in No. 3,770, and defendants in error in No. 3,829.

Rollo F. Hunt, of Devils Lake, N. D., C. E. Phillips, of Mankato, Minn., and James A. George, of Deadwood, S. D., for defendant in error in No. 3,770.

Before SANBORN, Circuit Judge, and W. H. MUNGER and TRIEBER, District Judges.

TRIEBER, District Judge (after stating the facts as above). [1] We will first deal with the action of the First National Bank, No. 3,770. By an act of Congress approved August 13, 1894 (28 Stat. 278, c. 280 [U. S. Comp. St. 1901, p. 2523]), every person entering into a formal contract with the United States for the construction of any public buildings, or the prosecution and completion of any public work, was required, before commencing such work, to execute the usual penal bond, with the additional obligations that such contractor or contractors shall promptly make payments to all persons supplying him or them labor and materials in the prosecution of the work provided

for in such contract. And such person to whom the contractor was indebted for labor and materials was given a right of action in the name of the United States for his use and benefit against the contractor and his sureties, provided that the United States was to be involved in no expense thereby.

By Act Feb. 24, 1905, c. 778, 33 Stat. 811 (U. S. Comp. St. Supp. 1911, p. 1071), the act of 1894 was amended so as to read as follows:

"That hereafter any person or persons entering into a formal contract with the United States for the construction of any public building, or the prosecution and completion of any public work, or for repairs upon any public building or public work, shall be required, before commencing such work, to execute the usual penal bond, with good and sufficient sureties, with the additional obligation that such contractor or contractors shall promptly make payments to all persons supplying him or them with labor and materials in the prosecution of the work provided for in such contract; and any person, company, or corporation who has furnished labor or materials used in the construction or repair of any public building or public work, and payment for which has not been made, shall have the right to intervene and be made a party to any action instituted by the United States on the bond of the contractor, and to have their rights and claims adjudicated in such action and judgment rendered thereon, subject, however, to the priority of the claim and judgment of the United States. If the full amount of the liability of the surety on said bond is insufficient to pay the full amount of said claims and demands, then, after paying the full amount due the United States, the remainder shall be distributed pro rata among said interveners. If no suit should be brought by the United States within six months from the completion and final settlement of said contract, then the person or persons supplying the contractor with labor and materials shall, upon application therefor, and furnishing affidavit to the department under the direction of which said work has been prosecuted that labor or materials for the prosecution of such work has been supplied by him or them, and payment for which has not been made, be furnished with a certified copy of said contract and bond, upon which he or they shall have a right of action, and shall be, and are hereby, authorized to bring suit in the name of the United States in the Circuit Court of the United States in the district in which said contract was to be performed and executed, irrespective of the amount in controversy in such suit, and not elsewhere, for his or their use and benefit, against said contractor and his sureties, and to prosecute the same to final judgment and execution: Provided, that where suit is instituted by any of such creditors on the bond of the contractor it shall not be commenced until after the complete performance of said contract and final settlement thereof, and shall be commenced within one year after the performance and final settlement of said contract, and not later: And provided further, that where suit is so instituted by a creditor or by creditors, only one action shall be brought, and any creditor may file his claim in such action and be made party thereto within one year from the completion of the work under said contract, and not later. If the recovery on the bond should be inadequate to pay the amounts found due to all of said creditors, judgment shall be given to each creditor pro rata of the amount of the recovery. The surety on said bond may pay into court, for distribution among said claimants and creditors, the full amount of the sureties' liability, to wit, the penalty named in the bond, less any amount which said surety may have had to pay to the United States by reason of the execution of said bond, and upon so doing the surety will be relieved from further liability: Provided further, that in all suits instituted under the provisions of this act such personal notice of the pendency of such suits, informing them of their right to intervene as the court may order, shall be given to all known creditors, and in addition thereto notice of publication in some newspaper of general circulation, published in the state or town where the contract is being performed, for at least three successive weeks, the last publication to be at least three months before the time limited therefor."

.This latter act was in force at the time this contract was entered into and the bond sued on executed, and therefore became a part of the contract. Pritchard v. Norton, 106 U. S. 124, 1 Sup. Ct. 102, 27 L. Ed. 104; Edwards v. Kearzey, 96 U. S. 597, 607, 24 L. Ed. 793; United States Fidelity, etc., Co. v. United States, for Use of Struthers Wells Co., 209 U. S. 306, 315, 28 Sup. Ct. 537, 52 L. Ed. 804.

[2] It will be noticed that the act of 1905, which takes up the entire subject covered by the act of 1894 and therefore is to be treated as a substitute act, repealing the former, materially changes the former act of 1894. Under the last-mentioned act, a suit on the bond could only be maintained against the sureties on the bond in the district where the defendants resided. Davidson Marble Co. v. Gibson, 213 U. S. 10, 29 Sup. Ct. 324, 53 L. Ed. 675. The first act gave no priority to the government of the United States, while the later act provides for such priority. There was nothing in the act of 1894 requiring all claims to be determined in one action, nor is there any limitation as to when the action is to be commenced, except such as may be prescribed by the laws of the state where the suit may be instituted. By the act of 1905 no suit can be instituted by a creditor on the bond of the contractor until after the complete performance of said contract and final settlement thereof, and it limits the time within which the suit is to be brought to one year, and then only if the government has failed to institute a suit within six months from the completion and final settlement of said contract. The action is to be brought by creditors in a court of the United States in the district in which the contract was to be performed and executed, irrespective of the amount in controversy, and not elsewhere. The act further provides that only one action shall be instituted by a creditor or creditors, but any other creditor may file his claim in such action and be made a party thereto within one year from the completion of the work under said contract, and not later. It also provides that the government shall have priority for any sum found to be due it, and the residue shall go to the other creditors, and if this balance recovered on the bond shall be inadequate to pay the amounts found due to all of said creditors, judgment shall be given to each creditor pro rata of the amount of the recovery. The surety was also permitted by that act to pay into court for distribution among said claimants and creditors the full amount of his liability, to wit, the penalty named in the bond, less any amount which said surety may have had to pay to the United States, and thereupon the surety was to be relieved from all further liability. Upon the institution of a suit by a creditor under that act, personal notice of the pendency of such suit is required to be given to all known creditors, and in addition thereto notice of publication in some newspaper of general circulation, published in the state or town where the contract is being performed, for at least three successive weeks, the last publication to be at least three months before the time limited therefor. Hill v. American Surety Co., 200 U. S. 197, 201, 26 Sup. Ct. 168, 50 L. Ed. 437; Mankin v. Ludowici-Celadon Co., 215 U. S. 533, 538, 30 Sup. Ct. 174, 54 L. Ed. 315; United States Fidelity, etc., Co. v. United States, for Use of Struthers Wells Co., supra.

The contractors having failed to comply with the terms of the con-

tract, it was declared forfeited, and the government completed the contract, and a final statement of the account made by the government, and a demand therefor on June 16, 1908. The First National Bank, not having instituted its suit within one year thereafter, applied to Congress for relief, and Congress enacted the following act, which became a law March 4, 1911 (36 Stat. 1170, c. 236):

"That all persons having supplied labor and materials for the prosecution of the work of making the main canal of the Belle Fourche irrigation project under the contract for the construction thereof, entered into by Widell-Finley Company, under date of April twenty-sixth, nineteen hundred and five, pursuant to advertisement for said contract, dated February tenth, nineteen hundred and five, and their assigns and legal representatives, are hereby given the full rights and remedies afforded to persons supplying labor and materials in the prosecution of public works, as set forth in the act of August thirteenth, eighteen hundred and ninety-four, entitled 'An act for the protection of persons furnishing materials and labor for the construction of public works,' to the same force, extent, and effect as if the act had not been amended, modified, or repealed, with full right of action in the name of the United States for his or their use and benefit against said contractors and sureties upon the bond furnished to the United States under the said contract: Provided, that such action and its prosecution shall involve the United States in no expense."

This act granted to all persons having supplied labor and materials for the prosecution of the work of making the main canal of the Belle Fourche irrigation project under the contract entered into by the Widell-Finley Company under date of April 26, 1905, and their assigns and legal representatives, the full rights and remedies which were afforded to such persons by the act of August 13, 1894, to the same extent and effect as if the act had not been amended, modified, or repealed by the act of 1905. After the passage of this act by Congress, the First National Bank on March 18, 1911, instituted its action as assignee of the laborers whose time checks it had purchased, in the Circuit Court for the District of Minnesota. Demurrers were filed by the defendants in each of the cases, and were overruled, and proper exceptions saved thereto. Thereupon answers were filed by both parties; but in view of the conclusions reached by us it is unnecessary to set out the issues raised by the answers.

In our opinion, the court below erred in overruling the demurrer in case No. 3,770. Under the act of 1905, which was in force at the time the sureties signed the bond, and which was a part of the bond obligation, any action on the part of laborers or other creditors of the contractors against the sureties on the bond had been barred by the statute of limitations, more than a year having then expired since the government had settled the accounts of the contractor and made a demand upon it and the sureties for the amount claimed to be due it by reason of the breach of the contract.

While it has been held in Campbell v. Holt, 115 U. S. 628, 6 Sup. Ct. 209, 29 L. Ed. 483, that a right to defeat any debt by the statute of limitations is not a vested right, so as to be beyond the legislative power in a proper case, that was in an action against the debtor himself. In this case the action is against the sureties; and, as the law is well settled that sureties are favorites of the law, and all their undertakings are construed strictly in their favor (Reese v. United States,

9 Wall. 13, 20, 19 L. Ed. 541; United States v. Freel, 186 U. S. 309, 316, 22 Sup. Ct. 875, 46 L. Ed. 1177; United States v. National Surety Co., 92 Fed. 549, 34 C. C. A. 526). Congress had no right to extend the statutory bar after it had once attached. The sureties, when they signed the bond, knew that under this statute, which was a part of their contract of suretyship, their liability to creditors as such sureties would cease 12 months after the work had been completed. If they held any securities to indemnify them, it was their duty to return them; if no suit was brought within that time, they would have a right to feel that they need exercise no further vigilance over their principal, that they had been released of all liability by operation of law. To extend the statute after they had been thus discharged places upon them a burden which they did not assume at the time they signed the bond. Edwards v. Kearzey, 96 U. S. 595, 24 L. Ed. 793; Pritchard v. Norton, 106 U. S. 124, 132, 1 Sup. Ct. 102, 108 (27 L. Ed. 104).

In the last case, in which this question was involved, Mr. Justice Matthews, who delivered the opinion of the court, said:

"The principle that what is apparently mere matter of remedy in some circumstances, in others, where it touches the substance of the controversy, becomes matter of right, is familiar in our constitutional jurisprudence in the application of that provision of the Constitution which prohibits the passing by a state of any law impairing the obligation of contracts; for it has been uniformly held that 'any law which in its operation amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the Constitution.' * * * Hence it is that a vested right of action is property in the same sense in which tangible things are property, and is equally protected against arbitrary interference. * * * A vested right to an existing defense is equally protected, saving only those which are based on informalities not affecting substantial rights, which do not touch the substance of the contract and are not based on equity and justice."

In United States Fidelity, etc., Co. v. United States, for Use of Struthers Wells Co., 209 U. S. 306, 315, 28 Sup. Ct. 537, 52 L. Ed. 804, these acts were similarly construed.

The demurrer to the complaint of the First National Bank should have been sustained, and the action dismissed.

In the action by the government, No. 3,829, the bill of exceptions, as it appears in the printed record, fails to set out any evidence by either party, except some exhibits, which fail to show any right of recovery by the government. Hence there is nothing before us that enables us to determine whether the court below committed any error.

The judgment in No. 3,829 is affirmed, and that in No. 3,770 reversed, with directions to set aside the judgment and sustain the motion of the defendants for a judgment notwithstanding the verdict, which is permissible under section 4362 of the Revised Laws of Minnesota of 1905.

SANBORN, Circuit Judge (concurring). An act of Congress, which at the same time and in itself authorizes or creates a new liability and prescribes the limitations thereof and of its enforcement, makes those limitations conditions of the liability itself. Such an

act is not a statute of limitations, and a compliance with the conditions which it prescribes is indispensable to the enforcement of the liability it authorizes or creates (The Harrisburg, 119 U. S. 199, 214, 7 Sup. Ct. 140, 30 L. Ed. 358; Pollard v. Bailey, 20 Wall. 520, 526, 527, 22 L. Ed. 376; Bank v. Francklyn, 120 U. S. 747, 756, 7 Sup. Ct. 757, 30 L. Ed. 825; Boyd v. Clark [C. C.] 8 Fed. 849; Brunswick Terminal Co. v. National Bank of Baltimore, 99 Fed. 635, 638, 639, 40 C. C. A. 22, 25, 26), because such limitations are conditions of the liability itself and not limitations of the remedy only. They are excepted from the rule announced in Campbell v. Holt, 115 U. S. 620, 628, 6 Sup. Ct. 209, 29 L. Ed. 483, to the effect that the right to defeat a just personal debt for a common-law liability, in that case for a conversion of the plaintiff's money, is not a vested right, which the Legislature may not overthrow at pleasure by extending the time for collecting it.

When these sureties made their contract the act of 1894 was no more. The act of 1905 had taken its place, and the provisions of that act were by operation of law written into and made an indispensable part of their contract. The contract for the construction of the canal and the contract of these sureties, their bond, were made on April 26, 1905, and the canal was dug and completed under the act of 1905. Conceding, without deciding, that the bank succeeded to the rights of the laborers whose time checks it bought, bearing in mind the fact that the United States brought no suit on the contract for the construction of the canal, or on the bond, within six months after June 16, 1908, the date of the completion and final settlement of the contract, and having regard to the terms of the act of 1905, which were written into and became an indispensable part of the bond, this was the contract of these sureties: That (1) on condition that some laborer or materialman, or the bank, should bring suit on their bond in the name of the United States for his or its benefit in the District Court of South Dakota where the contract was to be performed, and not elsewhere; (2) on condition that such suit should be brought within one year after June 16, 1908, and not later; (3) on condition that only one suit of this nature should ever be brought against them on this bond, and that all creditors should be notified thereof and should be permitted to intervene within one year after June 16, 1908, and not later; and on no other condition—and not otherwise, these sureties would be liable to the amount of their bond for the claims of the laborers and materialmen employed in the construction of the canal, who either appeared or intervened in accordance with these conditions in such a suit. None of these conditions was ever fulfilled, no suit on the bond of these sureties was ever brought in the District of South Dakota, no suit upon this bond was brought within one year after June 16, 1908, and on June 17, 1909, no liability of these sureties to pay any laborer or materialman anything whatever existed. Because the conditions on which alone they had agreed to be liable to any laborer or materialman, or to the bank, on or after June 16, 1909, had never arisen, they were as free of liability to them after that date as they would have been if they had never signed the bond, and they so remain unto this day.

It is not claimed that they did not so remain for more than one year and eight months after that date, and until the passage of the act of March 4, 1911. It is said that the act of 1911 did not impair the obligation of their contract. Let that proposition be conceded. It did not impair any obligation of the sureties to the laborers, materialmen, or the bank, or any obligation of the latter to the sureties, because subsequent to June 16, 1909, the sureties and these laborers, materialmen, and the bank were free from all obligation of any contract each to the other. The sureties were exempt from the obligation of any contract to the laborers, materialmen, or the bank after June 16, 1909, because they had not accepted the conditions on which alone the sureties agreed to stand liable. They owed them nothing and were under no liability to them, and therefore the act of March, 1911, did not impair any obligation of their contract. The vice of that act, as it seems to me, is not that it impairs the obligation of a contract; it is that it flies in the face of the inhibition of the fifth amendment to the Constitution that no person shall "be deprived of life, liberty or property without due process of law." Its legal effect is by a mere act of a legislative body to deprive the sureties of $23,-693.44, the amount of the judgment against them in this case, of their property, and to transfer it to the bank, to which the sureties were in no way liable. It is familiar law that any change in the contract of a surety, or in the contract for the performance of which the surety agrees to be liable, whereby attempt is made to increase his contractual liability without his consent, releases the surety. Miller v. Stewart, 9 Wheat. 680, 6 L. Ed. 189; Smith v. United States, 2 Wall. 219, 17 L. Ed. 788; Reese v. United States, 9 Wall. 13, 19 L. Ed. 541. How, then, can a new and independent contract and liability be imposed upon sureties by the mere fiat of a legislative body?

The vice of the Act of 1911 is that it makes a new contract for these sureties where they had been for months before its enactment free from all liability to this bank, to the materialmen, and the laborers, a contract of which they had no notice, and to which they never assented, whereby they are made liable to the bank for $23,693.44. There is no practical or legal difference between an act of Congress which declares parties who are free from liability to a bank to have made a contract which they never made to pay it $23,693.44, and to be without defense to an action to recover that amount, and an act that declares that $23,693.44 of the money or property of such parties shall be transferred to the bank. If the act of 1911 has any effect, it has the effect to deprive these sureties, who were free from all liability to the bank, of $23,693.44, and to transfer that amount of their property to the bank. This was done, if it was done at all, not by any process of law, but by the arbitrary act of a legislative body, without notice, trial, or hearing. An act of Congress which has such an effect not only violates the fifth amendment to the Constitution, but is beyond the powers of the legislative department of a republican government, and void. In Calder v. Bull, 3 Dall. 386, at page 388 (1 L. Ed. 648), Mr. Justice Chase said:

"There are acts which the federal or state Legislatures cannot do, without exceeding their authority. There are certain vital principles in our free re-

publican governments, which will determine and overrule an apparent and flagrant abuse of legislative power; as to authorize manifest injustice by positive law, or to take away that security for personal liberty, or private property, for the protection whereof the government was established. An act of the Legislature (for I cannot call it a law), contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. The obligation of a law, in governments established on express compact, and on republican principles, must be determined by the nature of the power on which it is founded. A few instances will suffice to explain what I mean. A law that punished a citizen for an innocent action, or, in other words, for an act which, when done, was in violation of no existing law; a law that destroys or impairs the lawful private contracts of citizens; a law that makes a man a judge in his own cause; or a law that takes property from A. and gives it to B.: It is against all reason and justice, for a people to intrust a Legislature with such powers; and therefore, it cannot be presumed that they have done it."

See Pritchard v. Norton, 106 U. S. 124, 132, 135, 1 Sup. Ct. 102, 27 L. Ed. 104; United States Fidelity Co. v. Struthers Wells Co., 209 U. S. 306, 312, 28 Sup. Ct. 537, 52 L. Ed. 804; Tyrell v. Rountree, 7 Pet. 464, 468, 8 L. Ed. 749; Gunn v. Barry, 15 Wall. 610, 622, 21 L. Ed. 212; Fletcher v. Peck, 6 Cranch, 87, 135, 3 L. Ed. 162; Hepburn v. Griswold, 8 Wall. 603, 623, 19 L. Ed. 513; Tillotson v. Millard, 7 Minn. 513 (Gil. 419), 82 Am. Dec. 112; Grinder v. Nelson, 9 Gill (Md.) 299, 307, 52 Am. Dec. 694; Regents v. Williamson 9 Gill & J. (Md.) 365, 408, 31 Am. Dec. 72; Bank v. Ballou, 98 Va. 112, 32 S. E. 481, 483, 44 L. R. A. 306, 81 Am. St. Rep. 715; Wade, Retro. Laws, §§ 159, 191; Gilman v. Tucker, 128 N. Y. 190, 28 N. E. 1040, 13 L. R. A. 304, 26 Am. St. Rep. 464; Ratcliffe v. Anderson, 72 Va. 105, 31 Am. Rep. 716; Murphy v. Gaskins' Adm'r, 69 Va. 207, 222; McCarty v. Hoffman, 23 Pa. 507; Greenough v. Greenough, 11 Pa. 489, 51 Am. Dec. 567; Wap, Attachm. (2d Ed.) §§ 17, 736; Bergman v. Sells, 39 Ark. 97, 101; Cole v. Cunningham, 133 U. S. 107, 116, 10 Sup. Ct. 269, 33 L. Ed. 538; Richardson v. Adler, 46 Ark. 49; Wade, Retro. Laws, §§ 171, 173.

For the reason which has now been stated I concur in the opinion and conclusion that the demurrer to the complaint in this suit for the benefit of the bank should have been sustained. This case, however, has been tried, and the question which has been discussed was raised, not only by demurrer, but also by a request for a directed verdict at the close of the trial, and by a motion for a judgment in favor of the sureties notwithstanding the verdict, pursuant to section 4362 of the Revised Laws of Minnesota of 1905; and as it appears from the entire record that the facts in this case do not constitute a legal cause of action against these sureties, and that no amendment to the complaint may avoid that result, it seems to me that in the interest of the speedy conclusion of this litigation a judgment in favor of the sureties notwithstanding the verdict should now be directed.

There is another reason for my conclusion that the judgment against the sureties should be reversed. It is that over their objection the cashier of the bank was permitted to testify, as against Mr. Eberhart, one of the sureties, that in 1905, before the bank bought the time checks, Eberhart said to the cashier that the bank would be perfectly

safe in buying them, because the effect of section 35 of the contract between the Widell-Finley Company and the United States was to make the sureties liable to the bank for the moneys owing on the checks it bought. This conversation took place long before the contract was completed, so that it could not have had the effect of estopping Eberhart from defending on the ground that the contractual conditions of his liability, which were to be complied with subsequent to the completion of the work, were not fulfilled. His conversation consisted merely of a statement of his opinion of the legal effect of a written provision of the contract between the Widell-Finley Company and the United States for the performance of which he had given his bond. Before his conversation was received in evidence the cashier had testified that he had consulted and obtained the opinion of the bank's attorney upon this very question, so that it did not appear that he relied upon Eberhart's opinion, and it seems to me that the statement of a surety under these circumstances of his opinion upon the question of the legal effect of a clause of a written contract, a question that is plain and fully open to all parties, cannot have the effect to estop him from insisting that his liability as a surety is measured by the true legal effect of that clause. I think the admission of this conversation was for this reason erroneous.

In the case of the United States for its own benefit against these sureties the government alleged in its complaint that in the completion of the contract with the Widell-Finley Company it necessarily expended $59,009.06 more than the contract price for the work, and it demanded judgment against the sureties for $21,500, the penalty of their bond, and interest. The sureties answered that the contract of the Widell-Finley Company was conditioned by a plan of the route of the canal, drawings and specifications of the work in reliance upon which the contractor was requested to bid and did bid and subsequently agreed to do the work, and the sureties gave their bond for the contractor's performance, but without their knowledge or consent the United States radically changed the route and location of the canal and the specifications therefor, so that the cost to the contractor in proportion to the contract price and the risk and hazard assumed by the sureties were vastly and wrongfully increased. It is assigned as error that:

"The court erred in holding and deciding that paragraph 24 of the specifications did not authorize changes in the plans of the canal, and that if changes were made as claimed by defendant it was sufficient to release the sureties."

Turning to the charge of the court on this subject, the record discloses the fact that it covers two printed pages. It was, in substance, that the contract was made upon the basis, not only of the specifications, but of a plan which had been offered in evidence and was marked Exhibit 2, that the sureties signed the bond to guarantee the performance of a contract made to do the work in accordance with this plan, that these sureties were entitled to have the canal built substantially upon the route indicated by that plan, that if the jury found that at the Vulcan cut the route, according to the plat referred to in the contract, went around the hill so as to make the construction a side hill

proposition and that it was afterwards changed by the government, without the knowledge or consent of the sureties, so as to make a cut through the hill, with high ground on each side of it, and this change made the contract less profitable to the contractor in the amount of $10,000 or $12,000, as testified to by the witnesses for the defendant, or if they found that a like change of the route at the Atlantic cut, as testified to by defendants' witnesses, made the contract less profitable to the contractor in the amount of $10,000 or more, then the provision of paragraph 24 of the contract that "the Secretary of the Interior reserves the right to make such changes in the specifications of work or material at any time as may be deemed advisable, without notice to the surety or sureties on the bond given to secure compliance with the contract, by adding thereto or deducting therefrom at the unit prices of the contract," constituted no answer to this defense of the sureties, and they were released from liability to the United States on their bond.

What changes did the parties intend to permit by the provision of paragraph 24 cited by the court below without notice to the sureties? The words of the contract answer: Such changes in the specifications of the work and material as might be reasonably and justly paid for by corresponding additions to or reductions of the unit prices therefor. Did they ever intend to agree by this provision that such a radical change in the route, location, or plan of the canal might be made that, although the contractor should be paid the unit prices for the work done and material removed, the profit of his contract would be diminished, or his loss upon it increased, $10,000 or $20,000? If the route of the canal designated by the plan had been along ground easily removed between a high and rocky mountain and a deep lake, could the government have changed its route under this provision so as to have required the contractor to make a tunnel through the mountain or an excavation for the canal in the bed of the lake? The provision and the entire contract must receive a reasonable, sensible interpretation, and a construction which would permit an affirmative answer to these questions would be neither rational nor permissible. It never was, it never could have been, the intention of the parties to this contract, that changes in the route and plan of the work which were neither just nor reasonable, which would change the character of the work so that the unit prices became neither remunerative nor fair, and which entailed loss upon the contractor out of all reasonable proportion to the contract price of the undertaking and greatly increased the liability of the sureties, should be made without releasing them. United States v. Freel, 186 U. S. 309, 312, 316–319, 22 Sup. Ct. 875, 46 L. Ed. 1177; United States Fidelity & Guaranty Co. v. United States, 194 Fed. 611, 616, 617, 116 C. C. A. 187.

The court charged the jury that if they found that the government made a change without the knowledge or consent of the sureties in the location or route of the canal portrayed in Exhibit 2, either at the Atlantic cut or at the Vulcan cut, which made the contract less profitable to the contractor in the sum of $10,000 or more, as testified by the witnesses for the defendant, the sureties were released from their liability

to the United States upon their bond. There are two reasons why this court may not adjudge this instruction erroneous. The first is that a change of plan or route of the canal which so modified the character of the work to be done that the work under the changed plan and route, when paid for at the unit prices, was $10,000 less profitable to the contractor than the work required according to the original plan and route, a change which thus increased the risk of the liability of the sureties $10,000, or almost one-half of the penalty of their bond, which was $21,500, was neither intended to be nor was it authorized by the contract without their knowledge and consent, and that change necessarily released the sureties. In other words, the charge on its face was right.

The second reason is that this is a court for the correction of the errors of the court below. The legal presumption is that its rulings were just and right, and the burden is on the plaintiff in error to prove by the record presented to this court that any ruling it challenges was erroneous. Sipes v. Seymour, 76 Fed. 116, 118, 22 C. C. A. 90; Lesser Cotton Co. v. St. Louis, I. M. & S. Ry. Co., 114 Fed. 133, 143, 52 C. C. A. 95. The charge was that if the government, without the consent of the sureties changed the plan and route of the canal from that shown on Exhibit 2, either at Atlantic cut or at Vulcan cut, so as to make the contract less profitable to the contractor in the amount of $10,000 or more, as testified by the defendants' witnesses, the sureties were released. The correctness of this charge is conditioned by the character of the change from the route portrayed by Exhibit 2 to which the defendants' witnesses testified. But the plaintiff in error has not brought to this court, by bill of exceptions or otherwise, either the plan shown by Exhibit 2 or the testimony of defendants' witnesses, and therefore it has failed to establish any error in the charge of the court, and has failed to present the criterion by which alone the correctness of this charge may be measured. The pleadings inform that the contract price of the work done was in the vicinity of $200,000 or $250,-000, that the government claimed that the cost of it was $59,009.06 more than the aggregate of the unit prices, and that the defendants claimed that the changes in the route and plan made by the government without their knowledge or consent greatly increased the cost of the work, and that, instead of the contract's entailing a loss of $59,009.06, it would have brought a profit of $10,000 to the contractor if it had been lawfully performed according to the plan and route specified before it was made. Here was a difference of over $69,000. Whether the witnesses for the defendants testified that all this increased cost was caused by the changes in the route of the canal this court is not informed. What changes in the character of the work done, of the materials removed, and in the cost thereof, the defendants' witnesses testified resulted from these changes, we know not. It was the original plan and route, and the testimony of the defendants' witnesses in reference to the changes of them and their effect, that induced the court below to give this instruction, and this court may not, in ignorance of this plan and this testimony, adjudge this instruction erroneous.

The other specification of error in this case is that the court—

"erred in its charge wherein it instructed the jury that paragraph 8 of the specifications was not effective after the government took over the work to render the engineer's decision on the question of classification final."

The contract was between the United States and the Widell-Finley Company, which was to do the work. The engineer was the Chief Engineer of the Reclamation Service. or one of his authorized assistants or inspectors, an officer of the United States. The parties to this contract agreed by paragraph 8 that upon all questions concerning the classification of the material in accordance with the specifications the decision of this engineer should be binding on both parties, and by paragraph 21 that upon the failure of the contractor to proceed with reasonable celerity to perform the agreement the Secretary of the Interior might "suspend the operation of the contract, * * * employ other parties to carry the contract to completion," or complete it himself. The legal effect of paragraph 8 was to choose the engineer as an arbiter or judge of the classification of material to be handled in a work in which each of the parties was engaged, a classification of material the character of which each of the parties necessarily knew as it was handled, so that each could, with full knowledge and great facility, present its claims to the arbiter before he decided. When, however, the Secretary suspended the operation of the contract, the Widell-Finley Company was no longer doing the work, was no longer aware of the character of the material removed, and was no longer in a position to present its claims as to its character and classification before the engineer rendered his decision, so that all his subsequent decisions were necessarily made ex parte.

Moreover, the Secretary was given the power to employ other parties to carry the contract to completion or to complete it himself. This authority necessarily included the power to make a contract for its completion for 'different prices and on different terms from those named in the original contract. In other words, the government was not bound, in making the contract with other parties for the completion of the original undertaking, or in hiring men to finish it, by the provision of the old contract that the engineer should be the final arbiter of the classification of the material, or by any other like term of the original contract, and as the government was not bound, neither was the contractor, the other party to the agreement, bound by any of these stipulations. The engineer ceased to be an arbiter of the classification of the material between the parties to the original contract when the government suspended its operation, and there was no error in the charge of the court upon this subject.

For the reasons which have now been stated, I concur in the affirmance of the judgment below in this case.

## Supplemental Opinion.

TRIEBER, District Judge. Since the filing of the opinion in this case the Supreme Court, in an opinion filed April 21, 1913, in Slocum, Executrix, v. New York Life Insurance Co., 228 U. S. 364, 33 Sup. Ct. 523, 57 L. Ed. ——, which was tried in a Circuit Court of

the United States in the state of Pennsylvania, has held that a statute of a state or rule of practice prevailing in a state court authorizing a court to enter a judgment notwithstanding the verdict cannot be followed in the national courts, being in conflict with the seventh amendment to the Constitution of the United States. The Circuit Court of Appeals for the Third Circuit upon writ of error had decided that upon the undisputed evidence the trial court should have sustained a motion of the defendant to enter a judgment in its favor notwithstanding the verdict of the jury was for the plaintiff, and reversed the case, with directions to enter such judgment. The Supreme Court, by a divided court (four of the justices dissenting), held that the conclusion reached by the Court of Appeals that the trial court should have directed a verdict in favor of the defendant, as the evidence failed to show that the plaintiff had a cause of action, was right, but that it erred in directing the trial court to enter a judgment for the defendant notwithstanding the verdict of the jury, as that is not permissible in the courts of the United States, but that it should have reversed the case, with directions to grant a new trial, in order that the parties may have the case resubmitted to a jury. In view of that decision we are of the opinion that the judgment heretofore entered in this cause, reversing the judgment of the lower court, with directions to enter judgment for the defendants, notwithstanding the verdict of the jury was for the plaintiffs, should be modified, and the cause reversed, with directions to grant a new trial and proceed in conformity with the opinion.