288

José A. Peña, Plaintiff, Appellee and Appellant, *v.* Eastern Sugar Associates, (A Trust), etc., Defendant, Appellant and Appellee.

No. 10699. Argued December 1, 1952.—Decided August 7, 1953.

*Fiddler, González & Nido* for appellant-appellee. *Cruz Ortiz Stella* for appellee-appellant.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

José A. Peña sued Eastern Sugar Associates in the former district court for unpaid wages for the period from May 19, 1948 to July 12, 1950. After a trial on the merits, a judgment in the amount of $1,141.78 was entered in favor of the plaintiff. Both parties have appealed.

I

It is conceded that the work of the plaintiff— during the time covered by the complaint he was a train

dispatcher in the office of the railroad operated by the defendant for the transportation of articles for interstate commerce —entitled him to be paid pursuant to the Federal Fair Labor Standards Act. There is likewise no dispute as to the hours he worked and the amounts he was paid therefor. On December 5, 1946 the plaintiff began to work for the defendant as a train dispatcher. From January 10, 1947 to January 23, 1948 he was paid a weekly salary of $34 for this work. On January 23, 1948, the parties signed a contract providing that the plaintiff's basic rate of pay would be $0.53125 per hour during the grinding season and $0.65384 per hour during the dead season; that it was anticipated that his services would be needed for not less than 56 hours a week during the grinding season and not less than 48 hours during the dead season; that for the time worked in excess of 40 hours a week he would be paid 1½ times the applicable basic rate; that for time worked in excess of 8 hours a day or during the day of rest provided by law, he would be paid double the basic rate; and that he would be guaranteed a weekly wage of $34 throughout the year.

The defendant appealed from that part of the judgment of the trial court holding that the regular rates of pay per hour provided in the foregoing contract, known as a *Belo* type of contract, were not controlling under the circumstances of this case. Congress provided in § 7 of the Federal Fair Labor Standards Act, 52 Stat. 1060, 29 U.S.C. 207, that if an employee works in excess of a certain number of hours a week, he shall receive overtime pay at not less than 1½ times "the regular rate" for all hours in excess of the statutory maximum workweek. But Congress did not define what constitutes "the regular rate" for purposes of calculating overtime. In *Walling* v. *Belo Corp.*, 316 U.S. 624, the Supreme Court upheld employment contracts under which the employer agreed to pay (1) a fixed regular rate of pay of 67¢ per hour, which was more than the minimum then

required by the Act; (2) not less than time and one-half such rate for overtime; (3) a guaranteed minimum weekly wage of $40. Under these provisions, with the then prevailing maximum workweek of 44 hours, an employee had to work more than 54½ hours in order to earn more than the guarantee. The court held that, under the circumstances of that case, the 67 cent hourly rate was the "regular rate" to be used in computing overtime. The 67 cent regular rate was accepted as not being fictitious.

Dodd, *The Supreme Court and Fair Labor Standards, 1941–1945*, 59 Harv. L. Rev. 320, describes the contracts in the *Belo* decision as follows (p. 357) : "The effect of these agreements was that, regardless of the number of hours actually worked, the employees would receive neither more nor less than forty dollars, except for weeks during which they worked fifty-four and one-half or more hours. In any week in which an employee worked less than forty-four hours —at that time the maximum hours which could be worked without penalty overtime—the so-called regular rate was wholly inapplicable. In any such week, the employee, without engaging in any overtime work, would receive more than sixty-seven cents per hour. In weeks in which the hours exceeded forty-four, it would be possible to characterize the amount paid in excess of sixty-seven cents per hour as overtime pay, but, unless the hours worked exceeded fifty-four and one-half, the actual weekly wage would be determined, not by the 'regular rate' provision of the contract and the overtime provision of the statute, but by the guaranty." To put it briefly, such a contract, if valid, enables an employer to pay a uniform weekly wage, which includes overtime pay, for workweeks of variable lengths. The employer need not pay more than the weekly guarantee, provided the number of overtime hours, if any, is sufficiently low to be covered by the weekly guarantee, which is considered under these circumstances as having been paid for all the hours worked at

the basic rate specified in the contract plus 50 per cent for the overtime hours.

The *Belo* approach to the problem of determining "the regular rate" for purposes of overtime pay has been severely criticized by the commentators.[1] Seemingly, the rationale behind it was undermined by such cases as *Walling* v. *Helmerich & Payne*, 323 U.S. 37; *Walling* v. *Hardwood Co.*, 325 U.S. 419; *Walling* v. *Harnischfeger Corp.*, 325 U.S. 427; *Madison Ave. Corp.* v. *Asselta*, 331 U.S. 199; *Bay Ridge Co.* v. *Aaron*, 334 U.S. 446. Yet, in the face of the almost universal predictions of its early demise, it has managed to survive.

In *Walling* v. *Halliburton Co.*, 331 U.S. 17, the court said at pp. 25, 26: "Knowing of the *Belo* decision, the Congress has permitted § 7 (*a*) to stand unmodified and the courts have applied it as so construed. Employers and employees (including those involved in this case) have regulated their affairs on the faith of it. Even if we doubted the wisdom of the *Belo* decision as an original proposition, we should not be inclined to depart from it at this time." Later, in *Bay Ridge Co.* v. *Aaron*, *supra*, speaking of the *Belo* case, the court said at p. 462 that "we have reaffirmed that decision as a narrow precedent principally because of public reliance upon and congressional acceptance of the rule there announced."[2]

In *McComb* v. *Roig*, 181 F. 2d 726 (C.A. 1, 1950), the court quoted with approval a description of the *Belo* doctrine

---

[1] Levy, *Belo Revisited*, XV Geo. Wash.L.Rev. 39; Feldman, *Algebra and the Supreme Court*, 40 Ill.L.Rev. 489; 13 U. of Chicago L. Rev. 486; 52 Yale L.J. 159; 89 U. of Pa.L.Rev. 982; 27 Va.L.Rev. 1096; 34 Calif. L.Rev. 227; 35 Calif.L.Rev. 589; 54 Harv.L.Rev. 1077; 44 Mich.L.Rev. 866.

[2] In 1949 Congress, by amendment to § 7(*e*) of the Act, wrote the *Belo* rule, with some minor modifications, into the statute. 63 Stat. 910. Under this amendment an employment contract may provide for payment of guaranteed weekly amounts to employees who work irregular hours, provided (1) the employee's duties necessitate irregular hours of work; (2) the contract specifies a regular rate of pay not less than the statutory minimum; (3) the contract provides for compensation at not less

appearing in *McComb* v. *Sterling Ice & Cold Storage Co.*, 165 F. 2d 265, 269–70 (C.A. 10, 1947) and reading as follows:

"From an analysis of these cases, we conclude that the correct rule to apply is that where employees work irregular hours under a contract fixing a regular hourly rate and providing time and one-half for overtime and also for a weekly guarantee, the hourly rate must have been intended to determine the weekly wages which it was contemplated would be paid for both regular and for overtime work, at not less than one and one-half times the amount thereof; and that the weekly guarantee must be such a sum as the parties contemplated would ordinarily result from the application of the hourly rate to the regular and overtime hours, taking into consideration that the hours of work were not fixed and that they varied somewhat *from week to week*. If the hourly rate fixed in the contract was such that it did not reasonably determine the weekly wages intended to be paid to the employees, according to the nature of their employment, for both regular hours and one and one-half times such hourly rate for the overtime hours for such hours as they would ordinarily work, it would be a fictitious rate. In such a case, the weekly guarantee would constitute the real wage and would be used in computing and determining the hourly rate." (Italics ours.)

We do not stop to determine if the contract before us, as applied to the work record of the plaintiff, meets all the requirements for application of the *Belo* doctrine. As the trial court pointed out, there is one fatal flaw in the defendant's case. The authorities make it clear that the regular rate of hourly pay specified in a *Belo* type contract is permitted to govern an employee's overtime pay provided (a) the nature of the employee's work necessitates irregular hours,

than 1½ times the regular rate of pay for all hours worked in excess of 40 in any workweek; (4) the contract establishes a weekly guaranty of pay; (5) the weekly guaranty, on the rates so specified, covers no more than 60 hours.

The 1949 amendments went into effect during the period of time covered by this complaint. However, we do not consider the problems which that fact might raise, as the result we reach in this case would be the same under either the *Belo* decision or the 1949 amendments. *Cf. Brewer, A "Belo" Primer for 1950*, 1 Labor Law Journal 94, 100.

and (*b*) the number of hours the employee works actually fluctuates from week to week. *Walling* v. *Belo Corp.; supra*, p. 632; *Walling* v. *Halliburton Co., supra*, pp. 19, 21; *Beachwood Lumber Co.* v. *Tobin*, 199 F. 2d 878 (C.A. 5, 1952); *McComb* v. *Roig, supra; Mc Comb* v. *Sterling Ice & Cold Storage Co., supra; McComb* v. *Utica Knitting Co.*, 164 F. 2d 670, 673 (C.A. 2, 1947); Interpretative Bulletin, Wage and Hour Division, January, 1950, Part 778.18, pp. 29–31.

 In the instant case the trial court made the following finding of ·fact: "It. is manifest from the evidence that the hours of work of the plaintiff do not fluctuate from week to week; that is, there was no irregularity or instability in his working hours; the nature of his work did not require him to work irregular or variable hours from week to week. On the contrary, his working hours were fixed. As a matter of fact, before entering into the contract, the plaintiff had a fixed day shift and, as such, worked regular hours." The undisputed facts in the record amply support the conclusion of the trial court that during the period covered by the complaint there was no necessity for the plaintiff to work irregular hours and that his hours of work did not in fact vary from week to week. On the contrary, with minor exceptions, the plaintiff worked a fairly stable workweek during the dead season and a somewhat longer but still fairly stable workweek during the grinding season.[3] The record "suggests a regularity of normal working hours readily susceptible to adjustment to the statutory policy."

---

[3] The parties stipulated that the grinding season was from February 1 to June 30. During the 51 weeks of crop season covered by the complaint, the plaintiff worked more than 56 hours a week on only two occasions: (1) the week ending March 9, 1949, for 59.25 hours; (2) the week ending May 24, 1950, for 60 hours. During the 62 weeks of dead season covered by the complaint, the plaintiff worked more than 48 hours on only nine occasions: seven of them for 56 hours, one for 52 hours, and one for 48.75 hours. The plaintiff received overtime pay on only four occasions—three times during the grinding season; once during the dead season. These are described in footnote 5. As indicated in the text of the opinion, even on those few occassions, the pay bore no relation to the overtime hours worked.

*McComb* v. *Utica Knitting Co., supra,* dissenting opinion, p. 678. Under those circumstances, the *Belo* decision does not apply and the so-called regular rate of pay provided in the contract involved herein has no bearing on the issue of overtime pay.

There are other difficulties confronting the defendant in this case. A *Belo* type contract is a highly intricate and delicate mechanism. Such a contract must be legal in every respect; the overtime payments for which it provides must in fact be paid and this must be done promptly; and its validity is judged by the actual work record of the plaintiff, and not simply the bare terms of the written or oral contract. *Madison Ave. Corp.* v. *Asselta, supra,* p. 204; *Bay Ridge Co.* v. *Arson, supra,* p. 464; *Walling* v. *Harnischfeger Corp., supra,* p. 430.

The contract and the conduct of the defendant in this case do not meet these standards. In the first place, as the trial court pointed out, as a matter of law the contract could not possibly be carried out, in view of the requirements for double pay for work in excess of 8 hours a day and for work on the day of rest.[4] In the second place, during the entire period of time covered by the complaint, the defendant, in

---

During the 51 weeks of grinding season, the plaintiff worked less than 40 hours a week—namely, 32 hours a week—for only three weeks. During the 62 weeks of dead season, the plaintiff worked less than 40 hours a week for only seven weeks. During these weeks the plaintiff worked 8, 32, 38, 21, 24, 32 and 16 hours, respectively.

[4] Footnote 4 of the findings of fact of the trial court reads as follows:

"The pay for 16 hours worked in excess of the 40 hours during the crop season as well as for the 8 hours in excess of the 40 hours during the dead season, computed at the rate of one and a half times, added to the 40 legal hours, in either period, makes a total of $34. (Crop Season: $0.53125 × 40) + ($0.53125 × 150% × 16) equals $34.00; Dead Season: ($0.65384 × 40) + ($0.65384 × 150% × 8) equals $34.00. However, as the contract provided that the hours in excess of 8 hours daily or during the rest day would be paid for at double the applicable basic rate, it is obvious that, according to the contract, the weekly guaranty of $34 could cover only 54 working hours during the crop season, even though the contract itself required not less than 56 hours of work a week. These 56 hours which were required amounted, according to the hourly rate fixed

violation of its own arrangement, paid the plaintiff $34 a week, without reference to the number of hours he worked, except for four weeks. And even for those four weeks, the extra sums paid to the plaintiff—ranging from 79¢ to $11.95 —bore no relation to the rates at which overtime was in theory supposed to be calculated under the contract.[5] In view of these considerations, the defendant would not prevail here even if it had been able to show that the plaintiff's work necessitated irregular hours and that his employment actually fluctuated from week to week.[6]

in the contract, to a weekly wage of $36.12. ($0.53125 × 40) + ($0.53125 × 150% × 8) + ($0.53125 × 2 × 8) equals $36.12."

On this same point, paragraph no. 13 of the findings of fact reads as follows:

"13. Although the contract provided that any time in excess of 40 hours weekly would be paid to the plaintiff at one and one-half times the basic rate, and any time worked in excess of 8 hours daily or during the day of rest specified by law at double the said basic rate, the plaintiff was not paid what actually corresponded to him under the said contract inasmuch as in the weeks during the crop season when he worked 56 hours he was only paid $34, when the correct thing would have been, under the system of the basic rate of pay per hour fixed in the contract, to pay him at the rate of one and half times the first 8 hours and at twice the basic rate for the other hours in excess of 48. This had to be so because any time over 48 hours necessarily had to be, either an hour worked in excess of the 8 daily hours or an hour worked during the rest day. The same thing happened as to the time in excess of the 56 hours, during the crop season, with the exceptions noted above, and with the time in excess of the 48 hours during the dead season."

[5] During the week ending March 9, 1949, the plaintiff worked 59.25 hours and was paid $11.95 extra; during the week ending May 18, 1949, he worked 52 hours and was paid $4.25 extra; during the week ending August 3, 1949 he worked 48.75 hours and was paid 79¢ extra; during the week ending May 24, 1950 he worked 60 hours and was paid $4.85 extra. The week ending August 3, 1949 was during the dead season. The other three weeks were during the crop season.

[6] The defendant concedes in its brief, as it did in the trial court, that, except for the four weeks listed in footnote 5, it did not pay the plaintiff the overtime required by its contract, even if we were to uphold its contention that the purported regular rate of pay per hour embodied in the contract was valid. It admits that during seven dead season weeks the plaintiff worked more than 48 hours a week and was paid only $34 a week. It concedes that it owes double pay therefor, using $0.65384 per hour as the regular rate, in the amount of $68.12.

It likewise concedes that it erred with reference to overtime pay in

■ Section 11 of Act No. 379, Laws of Puerto Rico, 1948, plays a limited role on the problem of whether the contract herein is a valid *Belo* type contract. That Section provides, in part that "Any clause or stipulation of a labor contract in which the compensation of the employee is fixed at a rate of wages by the day, by the week, or by the month, which consolidates the payment of regular hours and the extra hours of work, shall be null." Without reference to § 11, the provisions in the contract in this case for regular hourly rates of pay must stand or fall, depending on whether they meet the requirements of the *Belo* decision examined earlier in this opinion. If we had agreed with the defendant that the contract conformed to those requirements, the wage

the grinding season whenever the plaintiff worked more than 48 hours a week, as under the contract all time worked in excess of 40 hours a week was to be paid at time and a half, and all the time worked in excess of 8 hours a day or during the day of rest had to be paid for at the double rate. It states that "By error, since there is no other explanation, the hours in excess of 48 and also during the day of rest were paid at time and a half instead of at the double rate as required by the contract and by law." It therefore admits that for time worked during 22 weeks on days of rest, it owes $40.25 for ½ time, to bring the pay up to double time.

It also "explains" that in the week ending August 3, 1949, it paid for ¾ of an hour worked in excess of 8 hours a day at the regular rate of $0.53125 per hour, when it should have paid at the regular rate of $0.65384 per hour and $1.31 per hour for double time. It therefore owes the difference between 79¢ and 98¢, or 19¢.

Adding the figures of $68.12, $40.25 and 19¢, it concedes that it owes the plaintiff $108.56, which it is ready to pay, plus the corresponding penalties, or $217.12.

But these are not all mere "mathematical errors" as the defendant seems to believe. Rather they are a graphic demonstrations that in fact the arrangement was for a weekly guarantee of $34, irrespective of the hours worked. Employers wishing to use a *Belo* type contract cannot as in this case blandly ignore the work record of an employee, proceed to pay him only the weekly guarantee even where under the specified regular rate of hourly pay he is entitled to overtime pay exceeding the weekly guarantee, and then when suit is filed cure everything by offering hindsight to make the overtime payments it should have originally made when they were earned. Such conduct, the cases cited in the opinion hold, is strong evidence that the true rate of pay was embodied in the weekly guarantee and that the alleged regular rate of hourly pay was a fictitious and artificial contrivance.

rates per hour in the contract—$0.53125 during the grinding season and $0.65384 during the dead season—would have been valid and operative and would have been the controlling feature of the contract. But under those circumstances the contract would not have been prohibited by § 11 as the latter bars a rate of wages which "consolidates" the payment of regular and overtime pay only where the compensation is fixed at daily, weekly or monthly rates. As the trial court pointed out, it would have been absurd and pointless to include contracts fixing hourly rates within the inhibition of § 11.

On the other hand, we have already held (1) that the rates of $0.53125 and $0.65384 per hour fixed for the grinding and dead seasons, respectively, were fictitious and arbitrary and not the regular rate required by § 7 of the Federal Act; and (2) that, as a consequence, the weekly guaranty of $34 constitutes the real wage and is used in computing and determining the hourly rate. We thus see that in the instant case the same result commanded by § 11 takes place under the Federal Act without resorting to § 11.

█ The defendant argues vigorously in favor of this arrangement whereby a limited number of employees may be given throughout the year a guaranteed weekly wage in seasonal industries such as the sugar business. We do not dispute the economic desirability of such an arrangement for the stability of income for employees. But, for purposes of this case, we are constrained to hold that under the Federal decisions this is a self-defeating argument. The *Belo* doctrine was not evolved to solve the problems of seasonal industries. On the contrary, it came into being to meet the problem of workweeks of variable length, fluctuating from week to week. In a proper case the *Belo* decision may of course be applied to a seasonal industry as well as to any other industry. *Cf. Walling* v. *Anderson, Clayton and Company*, 12 Labor Cases par. 63, 790 (Tenn., Dist. Ct., 1947)

for a case where a *Belo* type contract *was* upheld in a seasonal industry. But those engaged in seasonal industries must look to other provisions of the Federal Act and to arrangements other than the *Belo* type of contract to solve the problems of seasonal industries which have fairly stable workweeks which vary sharply only as between seasons and not within the respective seasonal and dead periods.[7]

■ The only remaining contention by the defendant is that even if the plaintiff prevails on the merits, we should relieve the defendant of the liquidated damages provided in § 13 of Act No. 379. The employer does not contend that it may be relieved in whole or in part of these damages under Federal law. It confines its argument in one brief paragraph to a contention that we should not apply to it the liquidated damages established in § 13. A short answer to this argument is that the provision for liquidated damages in § 13 is mandatory. See *Tulier* v. *Land Authority*, 70 P.R.R. 249.

## II

■ ■ We turn to the only question raised by the plaintiff's appeal. Once we reject the contention that the parties entered into a valid *Belo* type contract, it becomes necessary to determine whether the weekly guarantee is divided by

---

[7] "An employer may validly establish by *prior agreement* with his employees a lower *specific* rate of pay for the busy season when more hours are worked than for the slack season, even if the purpose and effect of the two rates is to maintain a constant wage. So long as those rates are specified in advance, operate over substantial periods of time, and are bona fide in that they represent the rates at which the employee is actually paid at all times during each of the two periods, the Wage-Hour Division believes they should be regarded as 'regular rates' for the purpose of computing overtime pay. *Wage-Hour Div., Sp. Op.*, 11-4-42." Prentice-Hall, Wage and Hour, Labor Equipment, Vol. I, par. 10,353.3, p. 10,392; 3 C.C.H. Labor Law Reporter, par. 25,520.619. And see *Vives* v. *Serrallés*, 145 F. 2d 552 (C.A. 1, 1944); *McComb* v. *Roig*, 181 F. 2d 726, 728 (C.A. 1, 1950); Interpretative Bulletin, Wage and Hour Division, January, 1950, Part 778.9(*h*) pp. 21–22. *Cf. McComb* v. *Del Valle*, 80 F. Supp. 945 (Dist. Ct., P.R., 1948); *Waialua Agr. Co.* v. *Maneja*, 97 F.Supp. 198 (Dist. Ct., Hawaii, 1951).

the number of hours actually worked, or by some other number of hours, in order to ascertain the regular hourly rate on which overtime pay is based.

In passing on this problem, the Supreme Court of the United States and the state courts have held that under the Federal Act the "regular rate" per hour is determined by dividing the salary for each week by the total number of hours actually worked during that particular week. This, of course, results in a different "regular rate" of pay per hour for each week, depending on the number of hours worked during each week. *Bay Ridge Co.* v. *Aaron, supra,* pp. 460–61, and cases cited therein; *Mabee* v. *White Plains Pub. Co.,* 41 N.Y.S. 534, 540–41 (1943); *Tidewater Optical Co.* v. *Wittkamp,* 19 S.E.2d 897 (Va., 1942); *Graves* v. *Armstrong Creamery Co.,* 118 P. 2d 613 (Kansas, 1941); Annotation, 169 A.L.R. 1307, 1311; Annotation, 89 L.ed. 35, 57–59.

However, the trial court did not follow the foregoing rule for weeks in which the plaintiff worked more than 48 hours. Instead, it used the following formula: "For those weeks in which he worked less than 40 hours, there is no problem, as the $34 covers the 40 hours; those weeks in which he worked 40 hours and less than 48, it should be divided by the number of hours actually worked. Now, for those weeks in which the plaintiff worked 48 hours or more, it should be divided by 48 hours inasmuch as 'regular hours of work are...forty-eight hours during any week'. (Section 3 of Act No. 379.)" [8]

---

[8] As the foregoing quotation indicates, the trial court held that, for the weeks in which the plaintiff worked more than 40 and less than 48 hours, the divisor is the number of hours he actually worked and not 48 hours. The defendant does not challenge this holding. In not using as the divisor under these circumstances the regular 48 hour workweek allegedly established by Act No. 379, the trial court presumably followed the theory that the plaintiff was entitled to invoke the Federal rule rather than Act No. 379 whenever the former redounded to his benefit. See. *Chabrán* v. *Bull Insular Line,* 69 P.R.R. 250, 273 and footnote 9, *infra.*

The defendant concedes that the trial court acted correctly in refusing to follow the Federal rule which as we have seen is that in the absence of a valid *Belo* contract, the regular rate per hour is determined by dividing the salary for each week by the total number of hours actually worked during that particular week. The defendant agrees that a formula more beneficial to the employee is established by Act No. 379.[9] The only dispute is whether under the circumstances of this case Act No. 379 and Mandatory Decree No. 3 require the divisor to be 48 hours (as held by the trial court and contended by the defendants) or 40 hours (as contended by the plaintiff).

Section 2 of Act No. 379 provides as follows:

"Eight hours of work constitute the legal working day in Puerto Rico.

"Forty-eight hours of work constitute a working week.

"Two hundred and eight hours of work constitute a working month."

Section 3 of Act No. 379 provides that "Regular hours of work are eight hours during any period of twenty-four consecutive hours, forty-eight hours during any week..." Section 4 provides that extra hours of work are "...(*b*) The hours that an employee works for his employer in excess of forty-eight hours during any week, unless the hours worked daily in excess of eight are paid at double rates." Section 5 reads as follows:

"Every employer who employs or permits an employee to work during extra hours shall be obliged to pay him for each extra hour a wage rate equal to double the rate agreed upon for regular hours; *Provided, however,* That every employer in any industry in Puerto Rico covered by the provisions of the Fair Labor Standards Act enacted by the Congress of the United States of America on June 25, 1938, as heretofore or hereafter

---

[9] When it enacted the Fair Labor Standards Act, "Congress expressly permitted local minimum wage and maximum work-week statutes to subsist if they provided for higher standards than those found in the Federal Act." *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250, 273.

amended, shall be under obligation to pay only for each hour of work in excess of the legal eight-hour working day, or in excess of ·forty (40) hours a week, a wage at the rate of not less than time and a half the rate of wage agreed upon for regular hours, save when by a decree of the Minimum Wage Board or by a collective labor agreement, other working and or compensation standard is heretofore or hereafter fixed. *To determine the wage rate agreed upon for regular hours of work, the daily, weekly, or monthly wages, or wages otherwise stipulated, shall be divided by the number of regular hours worked during that same period in accordance with the provisions of this Act."* (Italics ours.)

As already noted, § 11 of Act No. 379 in effect enacts in a local statute some of the safeguards which restrict the use of a *Belo* type contract. Finally, § 7 provides that "If an employee works for a weekly wage, the wage stipulated shall cover solely the payment of the regular working hours during each week."

Mandatory Decree No. 3 provides in paragraph B(2)(*b*) that "No employer shall employ a worker in the industrial phase of the sugar business during the so-called 'dead season' for more that forty (40) hours in any workweek, unless the said worker receives pay at the rate of one and one-half times the minimum rate of applicable wages pursuant to the rates provided in paragraph B-1 of this Decree."

As we have seen, the Federal rule is that where a *Belo* contract fails the "regular rate" per hour is determined by dividing the weekly salary by the total number of hours actually worked during that particular week. But § 7 and the last sentence of § 5 of Act No. 379 change this rule, to the benefit of the employee, by providing that under these circumstances the divisor is the number of hours constituting the regular workweek. The defendant does not disagree. It asserts, however, that 48 hours is the regular workweek provided by §§ 2 and 3 of Act No. 379. It therefore argues that the impact of Act No. 379 requires the use of 48 hours as the divisor in a frustrated *Belo* contract.

We would unhesitatingly agree with this contention of the defendant that 48 hours, as the regular workweek established by §§ 2 and 3 of Act No. 379, would be the divisor if the plaintiff had been employed in a local industry. The difficulty is that the *Provided* clause in § 5 lays down a different rule for industries subject to the Federal Act. With possible exceptions not relevant here,[10] § 5 adopts the Federal standard of a 40 hour workweek for industries subject to the Federal Act. Consequently, as a general proposition, § 5 and the Federal Act, when read together, operate to make 40 hours the regular workweek for the industrial phase of the sugar business during the grinding season. And paragraph B(2)(b) of Mandatory Decree No. 3 and the Federal Act achieve the same result for the dead season, see *Caguas Bus Line* v. *Commissioner of Labor*, 73 P.R.R. 690. This contrasts with the other provisions of Act No. 379 which make *48* hours the regular workweek for local industry. It follows that, under the mandate of § 7 and the last sentence of § 5 of Act No. 379, the divisor here—the regular workweek—is 40, not 48, hours.

In view of the foregoing, we agree with the plaintiff and hold that the regular hourly rate of pay for each week in which overtime is owed must be obtained by dividing the weekly guarantee by 40 hours. Accordingly, we shall modify the judgment to that effect and shall remand the case to the

[10] Under § 7(c) of the Federal Act, employers in the industrial phase of the sugar business are not required to pay overtime for hours worked in excess of 40 hours by *certain* employees during the grinding season. *Cf.* footnote 7. But no contention is made here that the work of the plaintiff during the grinding season was covered by the exemption from overtime contained in § 7(c) of the Federal Act. Apparently he is an employee who must be paid overtime after 40 hours during the grinding season under the Federal Act. We therefore leave for another day what effect, if any, the *Provided* clause of § 5 of Act No. 379 had on the exemption embodied in § 7(c) of the Federal Act. In an appropriate case the sugar companies would presumably argue in effect that we must read into the *Provided* clause of § 5 the phrase, "where overtime pay is required by Federal law."

trial court for the necessary mathematical calculations. As thus modified, the judgment of the former district court will be affirmed.[11]

Mr. Justice Sifre did not participate herein.

---

ON MOTION FOR RECONSIDERATION
December 10, 1953

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

This case is now before us on a motion by the defendant for reconsideration of our opinion and judgment affirming, as modified by us, the judgment of the former district court in favor of the plaintiff in a suit for unpaid wages. In our order setting the motion for reconsideration for hearing we directed the parties to confine their arguments to the issue of prescription. We also invited the Secretary of Labor of the United States and the Secretary of Labor of the Commonwealth of Puerto Rico to present their views on the question of prescription.

This is a suit for unpaid wages for the period from May 19, 1948 to July 12, 1950. The complaint was filed on November 7, 1951. Section 6 of the Portal-to-Portal Act establishes a two-year statute of limitations for "any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act..." which accrues after May 14, 1947. 61 Stat. 84, 87, 29 U.S.C. (Supp. V) § 255; *Ricci* v. *El Mundo, Inc.*, 85 F.Supp. 82 (Dist. Ct., P. R., 1949).[1] The defendant therefore contends that the portion of the claim for wages which accrued from May 19, 1949 until November 7, 1949 was "forever" barred by § 6(a) of the Portal Act.

---

[11] We think it appropriate to say that the elaborate and able opinion and findings of fact and conclusions of law of the trial court have been of great aid to us in disposing of this case.

[1] Under § 6(a) "... such action shall be forever barred unless commenced within two years after the cause of action accrued..."

The first problem presented by the motion for reconsideration is that the defendant did not make the defense of prescription in the trial court or in its original brief in this Court. It is made for the first time in this motion for reconsideration. The defendant asserts that it is entitled to raise the issue of prescription at this stage of the case on the ground that it is a privileged question which may be raised at any time before the judgment becomes final.

The argument of the defendant that it may raise the defense of prescription at this time may be summarized as follows: Section 6 (a) of the Portal Act does not merely bar the remedy to sue after two years. Rather § 6 (a) extinguishes forever the right to unpaid wages once the prescriptive period has run. Stated another way, the Portal Act establishes a substantive rather than a procedural time limit. Accordingly, the failure of the defendant to plead or to offer testimony on the question of the statute of limitations in the trial court or to raise it in its original brief in this Court does not constitute a waiver of that defense. On the contrary, where as here a statute contains a substantive time limit, filing suit within the time prescribed is a condition precedent to recovery. Since the complaint here shows on its face that part of the claim is barred, the defendant could raise this defense for the first time in its motion for reconsideration in this Court. In support of this argument, the defendant cites *Rademaker* v. *E. D. Flynn Export Co.*, 17 F.2d 15 (C.A. 5, 1927); *Eberhart* v. *United States*, 204 Fed. 884, 890–1 (C.A. 8, 1913); *American R. Co. of Porto Rico* v. *Coronas*, 230 Fed. 545, 546 (C.A. 1, 1916); *Berry* v. *Heller*, 79 F.Supp. 476, 477–8 (Dist. Ct., Pa., 1948). See also *Engel* v. *Davenport*, 271 U.S. 33; *Sgambati* v. *United States*, 172 F.2d 297 (C.A. 2, 1949). None of these cases arose under the Fair Labor Standards Act.

Prior to enactment of the Portal Act, no Federal statute of limitations existed for wage claims arising under the Fair Labor Standards Act. Consequently, both state and Federal

courts applied the appropriate state statute of limitations thereto. *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250, 265; *Stillwell* v. *Hertz Drivurself Stations*, 174 F.2d 714 (C.A. 3, 1949), footnote 1, and cases cited. As such state statutes were generally remedial in nature, the rule before passage of the Portal Act was that under those circumstances the defense of prescription was waived unless it was pressed in the trial court. *Stillwell* v. *Hertz Drivurself Stations, supra.* Has that rule been changed by the Federal statute of limitations which has replaced the different state statutes for claims arising under the Fair Labor Standards Act?

The plaintiff and the Secretary of Labor of the United States argue that the rule laid down in the *Stillwell* case has not been changed by the Portal Act. Their thesis is that the limitation period in the Portal Act was intended merely as a substitute for the varying and extended periods of time under the state statutes, which are generally remedial statutes of limitation. They argue that the Federal statute can be tolled, for example, by service in the Armed Forces, see § 205 of the Soldiers' and Sailors' Civil Relief Act of 1940 as amended, 50 U.S.C.A. App. §. 525, or by concealment. They therefore insist that, unless raised by the defendant at the trial, the defense of prescription to a claim under the Federal Act is waived. For cases and discussions which shed some light on this problem, see *Unexcelled Chemical Corp.* v. *United States*, 345 U.S. 59, and the aftermath of the *Unexcelled Chemical* case as described in September 1953, Labor Law Journal 637–640; *Safrin* v. *Friedman et al.*, 17 Labor Cases, 77,183 (N. Y. Supreme Court, 1950); *United States* v. *Lovknit Mfg. Co.*, 189 F. 2d 454, 457 (C.A. 5, 1951); *Carrol* v. *Pittsburgh Steel Co.*, 100 F.Supp. 749 (Dist. Ct., Pa., 1951); *Sauerzopf* v. *North American Cement Corporation*, 93 N.E.2d 617 (N. Y., 1920); *Baysinger* v. *Hanser*, 199 S.W.2d 644 (Mo., 1947); *Carpenter* v. *United States*, 56 F. 2d 828 (C.A. 2, 1932); *Yablonsky* v. *City of New York*, 219 N.Y.Supp. 121 (1927); *Developments in the Law—*

*Statutes of Limitations*, 63 Harv.L.Rev. 1177, 1186–8, 1198–1200, 1234–5, 1261, 1266–7; Atkinson, *Pleading the Statute of Limitations*, 36 Yale L.J. 914.

We find it unnecessary in this case to decide the question raised by the above-described contentions of the parties as to when the issue of prescription may be raised under the Fair Labor Standards Act. We reach this conclusion because we agree with the plaintiff, the Secretary of Labor of the Commonwealth of Puerto Rico, and the Secretary of Labor of the United States that the claims involved herein are based not on the Federal Act but on local laws. The plaintiff claimed overtime compensation (1) for working more than eight hours a day on certain days, and (2) for working on certain days which were days of rest for him. In making these claims, he relied on Act No. 379 of 1948, Act No. 289 of 1946, and Mandatory Decree No. 3. In the same way, his claim for double compensation as liquidated damages because of the failure of the defendant to pay him in accordance with the said local statutes was based on § 13 of Act No. 379. [2]

In our original opinion we concluded that this case involved a frustrated *Belo* contract. But that does not change the fact that the claims herein arose under local laws. The contract for a guaranteed weekly wage which would generally include overtime compensation was held invalid in our original opinion. The only problem then remaining was to determine the regular rate of pay for the purpose of calculating overtime pay. The formula we adopted therefor came from the provisions of Act No. 379 of 1948. Moreover, none of the claims for overtime pay were predicated on the Federal provisions (1) for time and a half after forty hours a week and (2) for liquidated damages. On the contrary, as we have seen, overtime was based solely (a) on daily work

---

[2] As we pointed out in our original opinion, "The employer does not contend that it may be relieved in whole or in part of these damages under Federal law. It confines its argument in one brief paragraph to a contention that we should not apply to it the liquidated damages established in § 13."

after eight hours and (*b*) on work on days of rest. These claims—as well as the claim for liquidated damages—stemmed exclusively from local law.

We pointed out in *Chabrán* v. *Bull Insular Line, supra,* p. 273, that § 18 of the Federal Act "gave the States freedom of action to establish higher standards than those contained in the Federal Act. State legislation is superseded by the Fair Labor Standards Act only if the local statute provides lower standards than the Federal Act." The claims in this case arose under local laws which are valid because they establish standards of minimum wages and maximum hours not found in the Fair Labor Standards Act. Indeed, as we understand it, on the merits the defendant does not challenge in this case either the validity of these local laws or their applicability to the work of the plaintiff.

We find nothing in § 6 of the Portal Act or its legislative history indicating that Congress intended for it to apply as a statute of limitations to claims arising under valid State laws. In § 6 Congress was addressing itself exclusively to the problem of eliminating the varying state statutes of limitations previously used to enforce claims *arising under the Federal Act.* These state statutes were replaced by § 6, which on its face applies only to claims under the Fair Labor Standards Act. We are therefore of the view that Congress, which expressly permitted the States in § 18 of the Federal Act to provide by state laws for higher minimum wages and lower maximum hours for employees covered by the Federal Act, did not mean to occupy the field to the exclusion of state statutes of limitations for claims by such employees *arising under such valid State laws. Cf. Avila* v. *District Court,* 68 P.R.R. 10, 16–7, and cases cited; *Labor Relations Board* v. *N.Y. & P.R.S.S. Co.,* 69 P.R.R. 730; *Asoc. Empl. Bayamón Transit* v. *Labor Rel. Board,* 70 P.R.R. 273; *Labor Relations Board* v. *I.L.A.,* 73 P.R.R. 568; *Engel* v. *Davenport, supra.*

█ The claim here is for rights validly created by the Legislature of Puerto Rico. Consequently, the question of

prescription is governed by local law. *Cf. Avellanet* v. *Porto Rican Express Co.*, 64 P.R.R. 660, 669, footnote 10, 673, footnote 17, 675, footnote 20, 676, footnote 22, 678, footnote 24; Note, *Supreme Court Review of State Interpretations of Federal Law Incorporated by Reference*, 66 Harv.L.Rev. 1498. And the defendant does not contend either that the plaintiff's claim has prescribed under the laws of Puerto Rico or that it can under local law raise the issue of prescription at this late date. [3] We therefore reject the contention of the defendant that part of the claims herein are barred by the statute of limitations.

The motion for reconsideration will be denied.

Mr. Justice Belaval concurs in the result.

Mr. Justice Sifre did not participate herein.

---

ON SECOND MOTION FOR RECONSIDERATION
March 15, 1954

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

On November 7, 1951 the plaintiff, acting in his own name, filed a complaint in the former district court against the defendant for unpaid wages for the period from May 19, 1948 to July 12, 1950. After a trial on the merits, in which the plaintiff was not represented by counsel, the former district court entered a judgment in favor of the plaintiff from which both parties appealed to this Court.

Originally, the defendant made only two contentions on appeal: (1) the facts of this case involved a valid *Belo* contract; (2) even if no valid *Belo* contract existed here, we

---

[3] See *Avellanet* v. *Porto Rican Express Co.*, *supra*; *Jiménez* v. *District Court*, 65 P.R.R. 35; *Valiente & Cía.* v. *District Court*, 68 P.R.R. 491; *Chabrán* v. *Bull Insular Line*, *supra*; *Vicenty* v. *Corona Brewing Corp.*, 73 P.R.R. 131. See also, *Ramos* v. *People*, 67 P.R.R. 600; *Rivera* v. *De Choudens*, 63 P.R.R. 955; *Stillwell* v. *Hertz Drivurself Stations*, *supra*; *Colón* v. *Shell Co.*, 55 P.R.R. 575; *Desmornes* v. *Unknown Heirs of Adolfo Desmornes*, 13 P.R.R. 18, affirmed in *Burnet* v. *Desmornes*, 226 U. S. 145; *Catoni* v. *Martorell*, 38 P.R.R. 295; *Fornaris* v. *Font*, 44 P.R.R. 580; *Upton* v. *McLaughlin*, 105 U.S. 640.

should relieve the defendant of the liquidated damages provided in § 13 of Act No. 379, Laws of Puerto Rico, 1948. In our opinion of August 7, 1953 we rejected these contentions and to that extent affirmed the judgment of the trial court. [1]

On the other hand, in our opinion of August 7, 1953 we agreed with the contention made by the plaintiff in his appeal. The problem was to determine the regular rate of pay for the purpose of calculating overtime pay. This became necessary once we held, in passing on the defendant's appeal, that under the facts of this case the *Belo* type contract signed by the parties for a guaranteed weekly wage was invalid to the extent that it purported to include overtime compensation. The trial court agreed with the defendant that the regular rate per hour is determined in this case by dividing the salary for each week by 48 hours. We disagreed. We adopted the contention of the plaintiff and held that the divisor should be 40, not 48 hours, by virtue of certain provisions of Act No. 379 and Mandatory Decree No. 3. [2] Accordingly, we modified the judgment in this respect. As thus modified, the judgment of the trial court was affirmed.

---

[1] The defendant has never claimed that the issue of liquidated damages in this case is controlled by Federal rather than local law. In our opinion of August 7, 1953 we said the following: "The employer does not contend that it may be relieved in whole or in part of these damages under Federal law. It confines its argument in one brief paragraph to a contention that we should not apply to it the liquidated damages established in § 13. A short answer to this argument is that the provision for liquidated damages in § 13 is mandatory. See *Tulier* v. *Land Authority*, 70 P.R.R. 249."

[2] The Federal rule is that in the case of a frustrated *Belo* contract the regular rate of pay is determined, for the purpose of calculating overtime pay, by dividing the salary for each week by the total number of hours actually worked during that particular week. See Topic II of our opinion of August 7, 1953, and the cases cited therein. But the defendant has never contended that the Federal rule applies here. It agrees that a formula more beneficial to the employee is validly established by Act No. 379 of 1948. See *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250, 273. As we pointed out in our opinion of August 7, 1953, the only dispute was "whether under the circumstances of this case Act No. 379 and Mandatory Decree No. 3 require the divisor to be 48 hours (as held by the trial court and contended by the defendant) or 40 hours (as contended by the plaintiff)."

312

The defendant thereupon filed a motion for reconsideration in which *for the first time* it contended that, in view of the fact that the complaint was filed on November 7, 1951, the two-year statute of limitations established in § 6 of the Portal-to-Portal Act, 61 Stat. 84, 87, 29 U.S.C. (Supp. V) § 255, barred that portion of the claim for wages which accrued between May 19, 1948 and November 7, 1949. In our opinion of December 10, 1953 we denied this motion for reconsideration. We stated that it was unnecessary to decide whether the defense of prescription could be raised under the Portal Act for the first time in a motion for reconsideration in this Court. We reached this conclusion by the following reasoning: The claims involved herein were based solely on daily work after eight hours and on work on days of rest pursuant to Act No. 379 of 1948, Act No. 289 of 1946, and Mandatory Decree No. 3. None of the claims were predicated on the Federal provision for time and a half after forty hours a week. They therefore stemmed exclusively from local laws. The latter—providing for overtime pay (*a*) for daily work after eight hours and (*b*) for work on days of rest—are valid under § 18 of the Fair Labor Standards Act which permits local laws to establish standards of minimum wages and maximum hours superior to those found in the Federal Act. Congress did not intend for § 6 of the Portal Act to apply as a statute of limitations to claims arising solely under valid State laws; it provided in § 6 for a prescriptive period of two years for claims arising exclusively under the Federal Act. As the claims here are for rights validly created by local law only, the question of prescription is governed by local law. And under the laws of Puerto Rico the claims in this case have not prescribed nor can the defendant raise the issue of the statute of limitations at this late date, see cases cited in footnote 3 of our opinion of December 10, 1953.

For the reasons stated in our opinion of December 10, 1953 and the cases cited therein, we adhere to our

view that wage claims which are founded exclusively on local laws are governed by our local rule as to prescription even where the employee is subject to the Fair Labor Standards Act. But the defendant has filed a second motion for reconsideration, dated December 14, 1953, which is now before us, in which it asserts that we were mistaken in stating in our opinion of December 10, 1953 that all the claims in this case are for overtime pay for daily work after eight hours and for work on days of rest pursuant solely to local law. We agree that we committed this error. That is to say, in some instances the plaintiff did not work more than eight hours in a single day or on his day of rest but did work more than forty hours a week. Under these circumstances his claim was for time and a half after forty hours a week rather than for overtime pay for work exceeding eight hours a day or for work on his day of rest.

The plaintiff, the Secretary of Labor of the Commonwealth of Puerto Rico and the Secretary of Labor of the United States nevertheless contend that even as to the claims for time and a half after forty hours a week the local rule as to prescription is controlling. Under the *Provided* clause of § 5 of Act No. 379 and paragraph B(2)(*b*) of Mandatory Decree No. 3, the plaintiff in this case is entitled to pay at the rate of time and a half after forty hours a week; he is also entitled to exactly the same overtime pay under the Federal Act, see footnote 10 of our opinion of August 7, 1953. Since the wage claim for time and a half after forty hours a week could be supported by resort to either Federal or local law, the plaintiff and the *amici curiae* argue that the plaintiff is entitled to the benefit of the longer local prescriptive period by virtue of § 18 of the Federal Act. Cf. *Chabrán* v. *Bull Insular Line, supra*, p. 273.

The Secretary of Labor of the United States, in his brief as *amicus curiae*, states his position on this point as follows:

"The claim here is not under the Federal law but under a local law for which another local law has fixed a longer limitation

period: As already pointed out, section 18 of the Fair Labor Standards Act makes it clear that the Federal law does not supersede the stricter requirements of any state laws. ... Although Section 18 does not specifically mention the statute of limitations it seems to us that the reasonable inference is that none of the higher standards or stricter provisions of an applicable State law are affected by the Federal law.

"In its 'finding and policy' statement which serves as the introduction to the Portal-to-Portal Act, Congress referred to the varying limitation periods which applied to claims under the Federal law in the absence of a uniform Federal limitation period. However, we do not think that it follows that the Federal limitation period was intended to govern claims made under a state statute. In other words, the statutes of the various states still apply to wage claims under the state laws.

"The fact that Puerto Rico in Law 379 of May 15, 1948 adopts certain of the substantive provisions of the Federal law does not make the claim in this case any the less a claim authorized by the law of Puerto Rico. Further, there seems no reason why a shorter limitation period should apply to interstate business than to local business so far as the local law is concerned. Although the state statute incorporated substantive standards of the Federal Act, it does not incorporate the Portal-to-Portal Act. ... This action was brought under the state statute, and, therefore, even though the state requirements coincide in substantial respects with the Federal statute, it is our opinion that the state limitation period would apply to the relief provided in the state act."

There is of course a fairly formidable argument the other way: Congress was so concerned about the burden on interstate commerce resulting from the varying state statutes of limitations that it provided in § 6 of the Portal Act for a uniform prescriptive period of two years for wage suits under the Fair Labor Standards Act. Consequently, Congress could not have intended to permit individual states to reinstate for claims covered by the Federal Act the vexatious situation of differing state statutes of limitations which it had eliminated by § 6 of the Portal Act through

the device of enacting local statutes embodying exactly the same standards of minimum wages·and maximum hours of work found in the Federal Act in order to apply thereto the longer prescriptive periods provided by local law.

However, in view of the result we hereinafter reach in this case, we prefer to leave open the question of whether the Puerto Rican statute of limitations rather than § 6 of the Portal Act applies to wage claims for which the local and the Federal Act provide exactly the same compensation. For the same reason, we do not pass on the following question: The written *contract* between the parties—which was presumably valid except for the ineffective attempt to make the weekly guarantee include overtime pay—provided for time and a half after forty hours a week. *Quaere*, whether the local or the Federal statute of limitations applies to a claim founded on a *contract* rather than on Federal or local law where as here the terms of the contract coincide with both the Federal and the local law. [3]

We turn to the question left open in our opinion of December 10, 1953 and which we now believe we are required to decide in this case; namely, whether in a suit for unpaid wages due under the Fair Labor Standards Act the issue of prescription under § 6 of the Portal Act may be raised by the defendant for the first time on appeal. [4]

Prior to enactment of the Portal Act, no Federal statute of limitations existed for wage claims arising under the Fair

---

[3] The original brief filed in this Court by the defendant—arguing that it should be relieved of the liquidated damages provided in § 13 of Act No. 379 of 1948—contains the following statement: "The question presented here is a claim based on a contract for services. If the said contract is valid, no substantial sum is owed to the claimant. The said contract was signed voluntarily by the plaintiff. We believe that, under such circumstances, the claim for wages would stem from the result of a judicial interpretation of a contractual operation and not as a direct result of a willful failure to pay the wages established by law."

[4] The defendant of course seeks to raise this issue only as to that portion of the wage claim which, if the Portal Act applies, accrued more than two years prior to the filing of the complaint on November 7, 1951.

Labor Standards Act. Consequently, both state and Federal courts applied the appropriate state statute of limitations thereto. *Chabrán* v. *Bull Insular Line, supra,* 265; *Stillwell* v. *Hertz Drivurself Stations,* 174 F. 2d 714 (C.A. 3, 1948), footnote 1, and cases cited; *Developments in the Law— Statutes of Limitations,* 63 Harv.L.Rev. 1177, 1266–7; Annotations, 21 A.L.R. (2) 1327, 1357; 3 A.L.R. (2) 1097, 1169; 162 A.L.R. 237; 157 A.L.R. 545. As such state statutes were generally remedial in nature, the rule before passage of the Portal Act was that under those circumstances the defense of prescription was waived unless it was pressed in the trial court. *Stillwell* v. *Hertz Drivurself Stations, supra;* see *Hughes* v. *Werner's Estate,* 78 F.Supp. 762 (Dist. Ct., Ill., 1948).

The defendant contends, however, that the foregoing rule as to waiver of prescription has been changed by the Portal Act, which replaced the different state statutes of limitations for claims arising under the Fair Labor Standards Act. Congress provided in § 6 (*a*) of the Portal Act that suits under the Federal Act " . . . shall be *forever* barred unless commenced within two years after the cause of action accrued. . ." (Italics ours.) The defendant argues that § 6 (*a*) does not, as in the case of the pertinent state statutes, merely bar the remedy to sue after two years. Rather, according to the defendant, § 6 (*a*) extinguishes "forever" the right to unpaid wages once the prescriptive period has run. Stated another way, the defendant asserts that § 6 (*a*) establishes a substantive rather than a procedural time limit. It therefore follows, according to the defendant, that its failure to plead or to offer testimony on the question of the statute of limitations in the trial court or to raise it in its original brief in this Court does not constitute a waiver of that defense. On the contrary, the defendant's position is that where as here a statute contains a substantive time limit, filing suit within the time prescribed is a condition precedent to recover; the complaint here shows on its face that part of the claim is

barred; the defendant could therefore raise this defense for the first time in its motion for reconsideration in this Court. [5]

We are unable to agree with this contention of the defendant. We find nothing in the language or legislative history of the Portal Act which indicates that Congress intended to change the usual rule that statutes of limitations are generally remedial rather than substantive. *Developments in the Law—Statutes of Limitations*, 63 Harv.L.Rev. 1177, 1186-7. On the contrary, Congress explicitly stated in § 1 of the Portal Act that the limitation period therein is intended as a substitute for "the varying and extended periods of time" under the laws of the several States; and the latter are generally remedial statutes of limitation. See *Chase Securities Corp.* v. *Donaldson*, 325 U.S. 304. It must be conceded that the use of the word "forever" creates some difficulty; but the fact remains that Congress chose also to use "barred", the traditional word used when it is intended to bar a remedy rather than to extinguish liability as such. In addition, our view is supported by the fact that here the limitation period is contained in a separate statute and is not incorporated in the statute creating the right, as is usually the case where the time limit is substantive rather than procedural. *Developments in the Law—Statutes of Limitations*, 63 Harv.L.Rev. 1177, 1188, 1261; *Sgambati* v. *United States*, 172 F.2d 297 (C.A. 2, 1949).

To agree with the defendant that the defense of prescription may be raised for the first time in this Court would be in effect to deprive the plaintiff of his opportunity to show, if he could, that the statute of limitations had been tolled by such things as service in the Armed Forces, see §

---

[5] In support of this argument, the defendant cites *Rademaker* v. *E. D. Flynn Export Co.*, 17 F. 2d 15 (C.A. 5, 1927; *Eberhart* v. *United States*, 204 Fed. 884, 890-1 (C.A. 8, 1913); *American R. Co. of Porto Rico* v. *Coronas*, 230 Fed. 545, 546 (C.A. 1, 1916); *Berry* v. *Heller*, 79 F.Supp. 476, 477-8 (Dist. Ct., Pa., 1948). See also *Engel* v. *Davenport*, 271 U.S. 33; *Sgambati* v. *United States*, 172 F. 2d 297 (C.A. 2, 1949). None of these cases arose under the Fair Labor Standards Act.

205 of the Soldiers' and Sailors' Civil Relief Act of 1940, as amended, 50 U.S.C.A. App. § 525, fraud, or concealment. We are unable to conclude that Congress intended such a result. *Safrin* v. *Friedman*, 17 Labor Cases 77,183 (N.Y. Supreme Court, 1950) and *United States* v. *Lovknit Mfg. Co.*, 189 F.2d 454, 457 (C.A. 5, 1951) support our view. See Atkinson, *Pleading the Statute of Limitations*, 36 Yale L.J. 914, 926–7, 937, 945–8; *Burnet* v. *DesMornes*, 226 U.S. 145. *Cf. Carroll* v. *Pittsburgh Steel Co.*, 100 F.Supp. 749 (Dist. Ct., Pa., 1951); *Sauerzopf* v. *North American Cement Corporation*, 93 N.E.2d 617 (N.Y., 1950). For a different conclusion interpreting other statutes, see *Bausinger* v. *Hanser*, 199 S.W.2d 644, 646 (Mo., 1947); *Yablonsky* v. *City of New York*, 219 N.Y. Supp. 121 (1927); *Carpenter* v. *United States*, 56 F.2d 828 (C.A. 2, 1932); *Developments in the Law—Statutes of Limitations*, 63 Harv.L.Rev. 1177, 1199, 1234–5; cases cited in footnote 5. We are therefore of the view that under § 6 of the Portal Act the defense of prescription to a wage claim under the Fair Labor Standards Act is waived unless raised by the defendant at the trial.

The Comptroller General of the United States has indicated his agreement with the conclusion we have reached. In *Unexcelled Chemical Corp.* v. *U.S.*, 345 U.S. 59, the Court held that a suit brought by the United States under the Walsh-Healy Act to recover liquidated damages from a government contractor who knowingly employed child labor was barred under the two-year statute of limitations contained in § 6 of the Portal Act. The aftermath of the *Unexcelled Chemical* case is described in 4 Labor Law Journal 637–40. After the opinion of the Supreme Court was handed down, it developed that the government already had the money for which it had filed suit: it had withheld the sum in question from the amount due on the contract. The Comptroller General agreed with the Secretary of Labor that, despite the decision in the *Unexcelled Chemical* case, the government

was entitled to keep the money which had been withheld prior to the government's suit to collect it. A letter of August 6, 1953 from the Comptroller General to the company takes that position. The letter is quoted in 4 Labor Law Journal at pp. 639–40 and reads in part as follows:

"While you suggest that the Supreme Court of the United States has resolved the legal rights involved by its decision of March 9, 1953 . . . as stated in my letter of July 2, 1953, it appears that the Court decided only that the Government may not enforce liability for such damages through a suit commenced more than two years after the date when violations occurred. Apparently, the fact that collection already had been effected was not brought to the attention of the courts and was not considered by them, although it had been accomplished prior to the original action of the District Court on June 22, 1951. . . .

"The Department of Labor, reporting to this Office upon your request, has taken the view that 'the limitation provision of the Portal Act only forecloses resort to court action after a two-year period from the accrual of the cause of action' and that 'the withholding remedy is left unaffected'. The Departmental view is amplified by the Acting Solicitor, as follows:

" 'The language of the statute itself affords the most convincing argument for the latter position. Thus, section 6 of the Portal Act begins: "Any action commenced . . . to enforce any cause of action for . . ."; while section 7 reads in part: "In determining when an action is commenced for the purposes of section 6, an action . . . shall be considered to be commenced on the date when the complaint is filed; . . ." Clearly, these are terms of art, appropriate only to foreclosing suits in the courts. As the Supreme Court said in the *Unexcelled Chemical* case, "Congress . . . was addressing itself to law suits in the conventional sense."

" 'There is reason to believe that Congress did not intent to extinguish the liability as well as the remedy. When, in similar situations, it does so intend, it uses explicit language to that end. . . . It would have been very simple for Congress to have included some such provision in section 6 of the Portal Act, and the fact that it does not do so, but on the contrary employed well-established terms of art usually associated with ordinary remedial statutes of limitation, is deemed highly significant. . . .

" '. . . . . . . . .

"I agree that the effect of the recent Supreme Court decision may not be regarded as conclusive with respect to the liability of the Unexcelled Chemical Corporation in the matter, and, accordingly, must decline to revise the collection action heretofore taken."

In view of our conclusion that the defense of prescription under § 6 of the Portal Act may not be raised for the first time on appeal, the second motion for reconsideration, filed by the defendant on December 14, 1953, is denied. [6]

Mr. Justice Belaval concurs in the result.

Mr. Justice Sifre did not participate herein.

---

[6] The plaintiff, who tried the case himself in the former district court and has acted intermittently on his own behalf in this Court, mistakenly believed that his attorney had not fully protected the plaintiff's interests in connection with the second motion for reconsideration. We therefore deem it appropriate to state that counsel for the plaintiff has represented the latter ably and diligently at all times throughout the course of the proceedings before us.